**UNITED STATES of America, Appellee,**

**v.**

**Steven B. WEISS, Defendant–Appellant.**

**No. 155, Docket 90–1086.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 25, 1990.

Decided April 5, 1991.

[redacted]

Colleen P. Cassidy, New York City (The Legal Aid Society, Federal Defender Services Appeals Unit, New York City, of counsel), for appellant.

Jon Bevilacqua, Sp. Asst. U.S. Atty., E.D. New York, Brooklyn, N.Y., Kevan Cleary, Asst. U.S. Atty., E.D. New York, Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty. E.D. New York, Brooklyn, N.Y., of counsel), for appellee.

Joseph M. Lipner, Cambridge, Mass. (Alan M. Dershowitz, Cambridge, Mass., David Zwiebel, Morton M. Avigdor, Agudath Israel of America, New York City, of counsel), for amicus curiae Agudath Israel of America.

Before OAKES, Chief Judge, MESKILL, Circuit Judge, and RESTANI,* Judge.

MESKILL, Circuit Judge:

This is an appeal from a judgment of the United States District Court for the Eastern District of New York, Wexler, *J.*, entered after a jury trial, convicting Steven Weiss on counts of mail fraud, mail fraud conspiracy, and making false statements on Medicare and Medicaid forms in violation of 18 U.S.C. § 1341, 18 U.S.C. § 371, and 42 U.S.C. §§ 1395nn(a)(1) and 1396h(a)(1), respectively. Weiss appeals his conviction on several grounds, specifically the sufficiency of the evidence, bias by the court, prosecutorial misconduct, ethnic bias and several evidentiary rulings. We have already heard the appeal of Weiss' co-defendants Gleicher, Patient Medical Systems Corp. (PMSC) and Health–Med, Inc. (Health–Med), and have affirmed those convictions. *United States v. Weiss*, 914 F.2d 1514 (2d Cir.1990).

## BACKGROUND

The statutory and regulatory scheme for the payment of Medicare claims is set forth in *Weiss*, 914 F.2d at 1515–17. Familiarity with the payment scheme is assumed for purposes of this opinion.

From the evidence at trial the jury could have found the following facts. Health–Med was a supplier of durable medical equipment including seat lift chairs, to Medicare beneficiaries. Steven Weiss was president of Health–Med from 1983 until 1984. In 1984 Health–Med ostensibly ceased operation, although it continued to submit bills to Medicare carriers through PMSC, also a durable medical equipment supplier, until early 1986. When Health–Med ceased operation all employees were hired by PMSC, and PMSC took over the Health–Med clients. Steven Weiss became a vice president of PMSC, Barry Gleicher was president. Both Health–Med and PMSC were located at 220 Franklin Avenue, Franklin Square, New York.

Weiss and Gleicher first met in August 1983. They discussed the submission of Medicare bills and the use of computers for such billing. They continued these discussions through 1986. Weiss also discussed the submission of Medicare bills with Health–Med and PMSC employees.

---

* Honorable Jane A. Restani, *Judge,* United States Court of International Trade, sitting by designation.

Originally, Health–Med submitted Medicare claims for equipment sold to New York clients to the New York metropolitan area carrier, Blue Cross and Blue Shield of Greater New York (NY Blue Cross). In Box 31 of each Form 1500, the official Medicare claim form, the Health–Med address was listed as "220 Franklin Ave, Franklin Square, NY 11010." The reverse side of Form 1500 contained several paragraphs of information. The fifth paragraph on the reverse of Form 1500 stated: "Notice. Anyone who misrepresents or falsifies essential information to receive payment from federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable federal laws." The last paragraph on the reverse of Form 1500 stated: "I understand that payment and satisfaction of this claim will be from federal and state funds and that any false claims, statements or documents or a concealment of a material fact may be prosecuted under applicable federal or state laws, or both." Each claim form had to be signed by the supplier in Box 25. The signature was accompanied by a sentence stating "I certify that the statements on the reverse [side] apply to this bill and are made a part hereof."

In October 1983 Health–Med began submitting Medicare reimbursement claims for equipment, including seat lift chairs sold to New York residents, to the New Jersey carrier, Prudential Insurance Company (NJ Prudential). Weiss instructed Ms. Estee Weisz, an employee of Health–Med and then PMSC, to file the New York claims in New Jersey "because the reimbursement was higher." Box 31 of Form 1500 submitted to NJ Prudential listed the Health–Med address as "42 Edward Hart Drive, Jersey City, NJ 07303." The telephone number listed was (201) 355–3900. Health–Med's New Jersey stationery listed the same address and also contained an "800" number. At Weiss' direction, the New Jersey address was put on the forms by placing a label with the New Jersey address over the previously typed New York address.

No sales were made from that New Jersey address; Health–Med maintained a warehouse there. All mail was forwarded to Franklin Square, and all calls to the New Jersey number were call-forwarded to a New York number.

NJ Prudential, through a random inspection, discovered Health–Med's filing of New York claims in New Jersey. In a letter addressed to Weiss dated June 7, 1984 NJ Prudential noted that Health–Med had been "submitting Medicare claims for supplies sold or rented to beneficiaries in the State[s] of New Jersey, Illinois and New York." Prudential stated that it only would accept and process claims with a New Jersey point of sale and advised Health–Med to submit other claims to the appropriate states. Prudential also quoted section 3201.B of the Medicare Carriers Manual (Manual) which explains how a provider of services should determine the carrier to whom a claim should be submitted.

In response, Weiss wrote a letter asserting to NJ Prudential that the New Jersey Health–Med office handled sales for the tri-state area and a Service Bureau had been retained in New York to handle data processing and claims printing.

Based on the representations made by Weiss, NJ Prudential found no fraud in Health–Med's misfiling of claims as a result of its investigation. Mrs. Carol Harvey, an employee of NJ Prudential, testified that had NJ Prudential known that Health–Med had no sales people in New Jersey and that all calls to New Jersey were call-forwarded to New York, NJ Prudential would not have paid the claims. Health–Med ceased filing claims with NJ Prudential and NJ Prudential issued its last reimbursement check to Health–Med on February 15, 1985.

Once NJ Prudential refused to accept improperly filed Health–Med claims, PMSC and Health–Med, in March 1985, began to submit claims for equipment including seat lift chairs to the Ohio carrier, Nationwide Insurance Company (Ohio Nationwide). Weiss told a Health–Med employee that Ohio Nationwide paid a higher rate of reimbursement and processed claims more

quickly than NY Blue Cross. In Box 31 of Form 1500 the address for both companies as submitted to Ohio Nationwide was "1614 Miramar Court, Cincinnati, OH 45237." This was the address of Mrs. Lifshitz, a full-time mother of eight. Health–Med supplied (800) 645–6225 as its telephone number; PMSC provided (513) 381–0037, a Cincinnati number. All telephone calls, including those to the Cincinnati number, were automatically forwarded to Franklin Square, New York, and all mail received was also forwarded to New York.

An Ohio Nationwide representative found no medical supplies, equipment or commercial signs at the residence of Mrs. Lifshitz when he visited her. Mrs. Lifshitz was a PMSC and Health–Med employee but did not run a sales office. She made two sales of catheters and related equipment for Health–Med but she never sold any seat lift chairs. Mrs. Lifshitz did not process any PMSC claims submitted to Ohio Nationwide; all processing was done in New York, at Franklin Square.

In June 1985 Weiss spoke with an Ohio Nationwide employee who was inquiring about some of the claims filed. Weiss assured Ohio Nationwide that all contacts with Medicare beneficiaries originated from catalog distribution across the country and that the catalog was distributed from Ohio. Weiss claimed there was some phone contact and it always originated from Cincinnati. During the conversation Mr. Weiss quoted the Manual, specifically section 4105.8, which deals with suppliers who regularly do business outside the carrier's service area. Weiss also stated that PMSC had no sales offices outside of Ohio and West Virginia, then corrected himself, and stated that PMSC had a sales representative in Los Angeles. Weiss asserted that PMSC had no sales officials or representatives in New York.

Ohio Nationwide later discovered four claims improperly submitted to their office. By letter dated July 25, 1985 it returned the misfiled forms and explained that the claims should be submitted to the carrier at the point of sale, New York, regardless of whether the company used centralized bill-

ing. Ohio Nationwide also stated that this was in keeping with Medicare policy since 1977. The carrier went on to point out that its investigation indicated that the supplies were sold in the state of residence of the beneficiaries. Ohio Nationwide even supplied Weiss with the New York and Florida carriers so that PMSC could correct its billing.

Ohio Nationwide continued its investigation into PMSC and determined, through a study of PMSC claims and calls to adult homes in New York, that the sales of supplies and equipment including seat lift chairs were made from New York. On August 8, 1985 Ohio Nationwide wrote to Weiss and informed him of its intention to submit all PMSC claims received to NY Blue Cross and suggested that PMSC send the claims there directly.

PMSC, in a letter written primarily by Gleicher but signed by PMSC comptroller Vincent Pontillo, requested that the PMSC claims be returned to PMSC offices rather than forwarded to Blue Cross. Ohio Nationwide refused. Ohio Nationwide then issued its final check to PMSC on August 2, 1985.

After the claims were rejected by Ohio Nationwide, Gleicher ordered the computer programmer, Lori O'Rourk, to hold all PMSC supply bills and seat lift chair bills destined for Ohio. Gleicher and Weiss met and decided where to send the claims. After their meeting Gleicher told the programmer that all claims were to be sent to Illinois.

Later in 1985, PMSC and Health–Med began sending claim forms to the Illinois carrier, Blue Cross/Blue Shield of Illinois (Illinois Blue Cross). Box 31 of Form 1500 submitted by PMSC contained an Illinois telephone number and the following address: "540 Frontage Road, Northfield, IL 60093." Health–Med forms submitted to Illinois Blue Cross had the following address: "8600 West Bryn Mawr, North Chicago, IL."

Weiss signed a service agreement with Headquarters, Inc. (HQ), a company that contracted to receive and forward to New York all Health–Med mail and telephone

calls. Weiss was one of only three people authorized to receive phone calls from HQ. PMSC sent large envelopes to its national sales manager Timothy Dacy at the 540 Frontage Road address in Illinois, each with a Franklin Square return address. Each large envelope contained several smaller envelopes addressed to Illinois Blue Cross with the Frontage Road return address. The small envelopes were then sent, by certified mail, from an Illinois mailing service to Illinois Blue Cross.

In October 1985 reimbursement of PMSC claims was stopped pending an investigation. The Illinois Blue Cross investigation, conducted in February 1986, revealed that PMSC's Frontage Road office had two employees, a virtually empty file cabinet and no evidence of any medical supplies or equipment. An investigation of Health–Med operations at the Bryn Mawr address was also conducted. The receptionist at that address told Illinois Blue Cross that no one from Health–Med would be there and that mail and phone messages were forwarded to New York.

Thereafter, in a letter dated April 21, 1986, Illinois Blue Cross informed PMSC that it was transferring PMSC claims to NY Blue Cross. Illinois Blue Cross determined that the claims were for New York beneficiaries in New York nursing homes and explained to PMSC the point of sale rule. Mr. Aguilar, an employee of Illinois Blue Cross, testified that Illinois Blue Cross would not have paid any claims if it knew the point of sale was outside the carrier area.

Weiss claimed ignorance of the Medicare regulations dealing with the filing of claims. He professed to follow the advice of Gayle Uhlenburg, a former Health–Med vice president, when filing claims. Uhlenburg, however, testified that she acted at the direction of Weiss. Another former PMSC employee, Estee Weisz, testified that Weiss dealt with claim filing and that Weiss and Gleicher determined to which carrier a claim was to be submitted. Furthermore, the Medicare Manual and the CCH Medicare/Medicaid Guidebook (Guidebook) were kept in Weiss' office, and Weiss

was seen looking at the volumes periodically. Weiss also had several conversations with other employees about Medicare claim filing.

A government auditor calculated that Weiss and his co-defendants received $198,-753.48 more than they should have by filing claims with NJ Prudential, Ohio Nationwide and Illinois Blue Cross instead of NY Blue Cross.

## DISCUSSION

### A. *Insufficiency of the Evidence*

Steven Weiss contends that the evidence at trial was insufficient to prove that he committed the crimes charged, specifically the false statements and mail fraud counts. A criminal defendant challenging the sufficiency of the evidence bears a heavy burden. *United States v. Casamento,* 887 F.2d 1141, 1156 (2d Cir.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990). The evidence in a case must be viewed in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Vanwort,* 887 F.2d 375, 385 (2d Cir.1989), *cert. denied sub nom. Chapoteau v. United States,* —— U.S. ——, 110 S.Ct.1927, 109 L.Ed.2d 290 (1990), and *cert. denied sub nom. DaSilva v. United States,* — U.S. ——, 110 S.Ct. 1936, 109 L.Ed.2d 299 (1990). " '[A] reviewing court must draw all available inferences, and resolve all issues of credibility, in favor of the jury's verdict.' " *United States v. Tyler,* 758 F.2d 66, 68 (2d Cir. 1985) (quoting *United States v. Young,* 745 F.2d 733, 762 (2d Cir.1984), *cert. denied sub nom. Myers v. United States,* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985)). The verdict must be upheld if " '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Resto,* 824 F.2d 210, 212 (2d Cir.1987) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)).

### 1. *False Statements Counts*

■ Relying on *Bronston v. United States,* 409 U.S. 352, 93 S.Ct. 595, 34

L.Ed.2d 568 (1973), Weiss asserts that a conviction for false statements cannot be based on a statement that is literally true. Weiss' reliance on *Bronston*, however, is misplaced. The evidence in this case shows that the point of sale address was required in Box 31 of Form 1500. The information provided in Box 31 by Weiss, Health–Med and PMSC on claims submitted to New Jersey, Ohio and Illinois carriers was not, in fact, the point of sale address but rather contained the addresses of other offices, real or sham, located in states where the Medicare carrier offered a higher reimbursement rate.

Box 31 of Form 1500 requires that a supplier set forth its name, address, zip code and telephone number. The Manual explains the proper address to be shown. The appropriate carrier to which a reimbursement form should be sent is the one "where the service is furnished to the beneficiary.... (This means the site where the company met with the beneficiary or received the beneficiary's call.)" *Medicare Carriers Manual,* § 3102.B, at 3–63.2 to 3–64.1. The Guidebook, a copy of which was located in Weiss' office, explains that this is the same information that was required in Box 8 of Form 1490, the predecessor to Form 1500, and that the information is important for determining the carrier to which claims should be directed.

Weiss was informed several times by different carriers that reimbursement claims were to be submitted to the carrier in the district where the sales were made. Each carrier told Weiss that the claims should be submitted to NY Blue Cross which had jurisdiction over the New York point of sale of the seat lift chairs for which reimbursement requests were filed. *Weiss,* 914 F.2d at 1523. Weiss, however, continued sending claim forms to non-New York carriers who provided higher reimbursements.

Evidence presented at trial also indicated that Weiss was completely aware of the ongoing fraud and false statements and was, in fact, an active participant. Weiss discussed sending claims to states with higher reimbursements. Weiss ordered employees to put the New Jersey address on claim forms from New York sales for submission to NJ Prudential. Weiss and Gleicher ordered the computer reprogrammed to send claims from Ohio to Illinois and ordered use of the double envelope scheme. Weiss conversed with employees on the importance of using an out-of-state address for out-of-state carriers. Cumulatively this evidence was sufficient to support the jury's conclusion that Weiss intentionally made false statements on the Form 1500s filed with NJ Prudential, Ohio Nationwide and Illinois Blue Cross.

### 2. *Mail Fraud Counts*

■ Weiss claims that the rules relating to the submission of claims were unclear and confusing and therefore could not provide the basis for a criminal conviction. We also find this claim to be without merit.

As we have already decided, the "Manual explains the basis upon which a provider of services is to determine to which carrier it should submit a claim." [1] *Weiss,* 914 F.2d at 1516. Form 1500 requires the submission of the address of the point of sale. The Manual and Form 1500 combine to set out the method of determining a carrier.

---

1. Section 3102.B of the Medicare Carriers Manual (Manual) states, in pertinent part:

 Jurisdiction of payment requests for services of a supplier ... with branch offices or sales/rental outlets in more than one carrier's jurisdiction lies with the carrier for the location where the service is furnished to the beneficiary whether or not the supplier uses a central billing office. (This means the site where the company met with the beneficiary or received the beneficiary's call.) All claims for the services of suppliers from branch offices or sales/rental outlets outside the carrier's service area must be transferred to the appropriate carrier for processing.

 Manual, § 3102.B, at 3–63.2 to 3–64.1. We have also noted that "[i]n addition to being published in the Manual, the rules governing the carrier to which a claim should be submitted are also from time to time published by the carriers themselves, in publications they send to providers." *United States v. Weiss,* 914 F.2d 1514, 1516 (2d Cir.1990) (citing *Medicare Newsletter for Durable Medical Equipment Suppliers,* at 8 (Nationwide Mut. Ins. Co., Ohio July 1981)).

The evidence indicates Weiss was familiar with the Manual, he was seen reading it on a number of occasions, he discussed the submission of claims to various carriers with Health–Med and PMSC employees and was the recipient of correspondence relating to carrier jurisdiction from various carriers.

Weiss relies on *United States v. Porter*, 591 F.2d 1048 (5th Cir.1979), to support his vagueness argument.[2] A central issue in that case was the meaning of the words "bribe" and "kickback" and the definition and limits of 18 U.S.C. § 371, proscribing conspiracies to defraud the United States. *Id.* at 1055. In reversing Porter's conviction, the Fifth Circuit held that the statute did not prohibit "handling fees." That court also noted that reports or records filed with the government were not falsified and that the government had not been defrauded.

Unlike *Porter*, Weiss made or caused to be made actual false statements on every claim form filed that listed in Box 31 an address other than the point of sale address. Weiss' case more closely resembles *United States v. Huckaby*, 698 F.2d 915 (8th Cir.1982), *cert. denied*, 460 U.S. 1070, 103 S.Ct. 1526, 75 L.Ed.2d 948 (1983), where a Medicaid provider committed fraud by misrepresenting the actual health care services provided and thereby obtained higher reimbursements. In this action, although Weiss did not misrepresent the services provided, he did misrepresent *where* the services were provided, thereby fraudulently obtaining higher reimbursements. Thus, unlike *Porter*, Weiss' conduct actually defrauded the government by filing false information.

Weiss points to no specific language on Form 1500, in the Manual, or in the Guidebook, as being vague, unclear or confusing. Box 31 required Weiss and his co-defendants to provide the supplier's address. The Manual "stated that the carrier would use the information in Box 31 to determine whether it had jurisdiction over the particular claim." *Weiss*, 914 F.2d at 1523. Other sections of the Manual explained the manner in which jurisdiction was to be decided, based on where a sale was actually made.

The carriers told Weiss to submit claims to the carrier at the point of sale, specifying that the "point of sale" for seat lift chairs sold to New York beneficiaries and supplied by a New York provider was New York. It is this language Weiss has seized upon as being vague and confusing. The carriers often used the term "point of sale" when informing Weiss of the proper carrier to which claims should be submitted. While Weiss asserts that the carriers did not use the term consistently, the definitions for this term provided at trial by representatives of the carriers were consistent with the jurisdictional rules set forth in the Manual. Even assuming, without conceding, the verity of Weiss' claim that carriers used slightly different definitions for the term, every carrier determined that the "point of sale" was New York. No disagreement among carriers ever existed on this issue.[3]

Weiss' claimed confusion is especially implausible when we consider that sales were made from a New York office to New York beneficiaries with no other state involved in the sale. Absent the involvement of other states there is just no source of confusion. Other states were only implicated when Weiss filed Medicare claim forms with the wrong carrier.

Weiss next claims that the Manual applies only to carriers, not suppliers. We

---

**2.** In *Porter*, doctors changed their procedures from using automated blood tests and filing their own claims to using manual blood tests and having the claims submitted by the lab. The carrier had a record of providing higher reimbursements for labs, and paid a much higher reimbursement for manual blood tests than for automated tests. The operator of the manual lab, Porter, paid the doctors, through a dummy corporation, a "handling fee" in return for their referrals.

**3.** Weiss claims that the rule is vague because NJ Prudential did not conclusively find fraud in Health–Med's claim filing. This is a futile attempt at bootstrapping. NJ Prudential found no fraud, in large part, by relying on false and misleading statements made by Weiss that the New Jersey warehouse was responsible for all sales in the tri-state area.

have already held that it is Form 1500, not the Manual, "that required the submission of the point of sale address in Box 31." *Weiss,* 914 F.2d at 1521. The Manual, therefore, is not the basis for this prosecution. The fact that the Manual explained the address required in Box 31 does not affect Weiss' conviction for knowingly providing false information on Form 1500. Furthermore, Weiss filed or caused to be filed false and misleading information with Medicare carriers despite the specific certification of truth made with the signing of every Form 1500. The certifications and notices on the reverse side of form 1500 gave Weiss adequate warning of the penalties for filing false information on the claim form.

Familiarity with the Manual, as exhibited by use of the Manual and the content of explanatory letters sent by the carriers, may be sufficient to show defendant had the specific intent to commit the crime. *United States v. Gold,* 743 F.2d 800, 815–16 (11th Cir.1984), *cert. denied,* 469 U.S. 1217, 105 S.Ct. 1196, 84 L.Ed.2d 341 (1985). As noted, several employees saw Weiss reviewing both the Manual and the Guidebook. His familiarity with the Manual and his conversations with employees and carriers indicate that Weiss was acquainted with the sections of the Manual dealing with carrier jurisdiction and the carrier with whom claims should be filed. As a result, Weiss' claim that Form 1500 itself does not elaborate the specific address required is specious; the jury could have concluded that Weiss knew that the point of sale address was required in Box 31.

Weiss' obvious attempts to circumvent the requirements of Form 1500 and the Manual further support the jury's belief that he had a clear understanding of the rules and knew that his conduct was prohibited. Upon learning that other carriers provided higher reimbursements, Weiss directed claims to New Jersey. When New Jersey discovered the misfiling Weiss directed claims to Ohio. When Ohio began sending the claims to the New York carrier Weiss participated in the decision to send claims to Illinois.

### 3. *Medicaid Fraud Counts*

Weiss contends that there were no false representations made on Medicaid forms. The Medicaid fraud, however, derived from the Medicare fraud. While it is true that the amounts reported on the Medicaid forms were actually approved and paid by Medicare, the amounts were fraudulently obtained, as explained above. Higher allowable costs had been obtained by knowingly filing claim forms with the wrong carrier. Because Medicaid pays the twenty percent of the allowable cost not covered by Medicare, a fraudulently obtained higher allowable cost from Medicare automatically results in a fraudulently obtained higher reimbursement from Medicaid. Had the proper Medicare amounts been used, Medicaid would have paid less money. The evidence, therefore, also was sufficient to support a conviction for Medicaid fraud.

### 4. *Illinois Claims*

■ Weiss' assertion of insufficiency of evidence with regard to the false statements in Illinois also is without merit. Lori O'Rourk, a PMSC employee, indicated that Weiss took part in the determination of where to send claims after they were rejected from Ohio. Tim Dacy testified that Weiss instructed Dacy to use the double envelope scam, sending the individual claim envelopes to Illinois for postmarking. Moreover, Weiss signed the service agreement with HQ, the company that received and forwarded to New York the Health–Med mail and telephone calls. Weiss was also one of only three people authorized to receive phone calls from HQ. This evidence is sufficient to support the jury's conclusion that Weiss participated in the Medicare fraud in Illinois.

### B. *Paperwork Reduction Act*

■ Weiss avers that violations of the Medicare Carrier's Manual cannot be the basis for criminal convictions because the Manual was published in violation of the Paperwork Reduction Act. This argument was raised and rejected in the appeal of Weiss' co-defendants. *Weiss,* 914 F.2d at

1520–23. Applying that precedent to Weiss, we hold that Weiss' criminal conviction is not barred by the Paperwork Reduction Act.

## C. Deprivation of Fair Trial

### 1. Prosecutor's Improper Cross-Examination

■ Weiss contends that the prosecutor's mode of cross-examination deprived him of a fair trial. Specifically, Weiss alleges that the prosecutor improperly summarized testimony of prior witnesses, compared it to contradictory testimony just provided by Weiss, and asked Weiss if he recalled the witnesses' testimony. Weiss claims that this manner of cross-examination forced Weiss to comment directly on the credibility of other witnesses, thereby depriving him of a fair trial.

In support of his position Weiss relies on *United States v. Richter*, 826 F.2d 206 (2d Cir.1987). In *Richter*, the prosecutor directly confronted the defendant with testimony of law enforcement officers and put the defendant to the choice of testifying that the law enforcement officers were mistaken or lying. The prosecution further attacked the credibility of the defendant by introducing rebuttal witnesses after the defendant testified, buttressing the testimony of the law enforcement officers. Finally, the prosecutor relied heavily on the defendant's characterizations of the law enforcement officers' testimony in summation. *Id.* at 208–09. The prosecutor stated, in effect, that a judgment for the defendant meant that all the government agents were lying. We held that the prosecutor's combined cross-examination and summation were improper and deprived Richter of a fair trial.

The misconduct in *Richter*, removing credibility determinations from the ambit of the jury through improper questioning and summation, was not present in Weiss' trial. Credibility determinations, indeed, are for the jury, *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 628, 64 S.Ct. 724, 729, 88 L.Ed. 967 (1944), but, contrary to Weiss' assertions, that function was not usurped in this case. While Weiss was questioned as to his recollection of the testimony of other witnesses, he was not consistently given the limited option of stating those witnesses were incorrect or lying about the substance of their testimony. Nor were the witnesses who testified against Weiss federal agents or law enforcement officers whose credibility might be strengthened by the association with the government. *See United States v. Scanio*, 900 F.2d 485, 493 (2d Cir.1990). On the contrary, the witnesses against Weiss were, for the most part, prior employees of Weiss or employees of Medicare carriers. In addition, no rebuttal witnesses were called to substantiate the testimony of government witnesses after Weiss testified. Furthermore, the prosecutor did not, in his summation, state that a verdict for Weiss was essentially a finding that all of the government's witnesses were lying. *See Richter*, 826 F.2d at 209. Weiss' reliance on *United States v. Victoria*, 837 F.2d 50 (2d Cir.1988), is also unpersuasive. *Victoria* involved an action in which the court departed from an appearance of impartiality and flagrantly took sides. *Id.* at 54–55. Judicial bias of this nature has not been shown here.

Weiss also states that in phrasing his questions for cross-examination the prosecutor maintained a running summation, mischaracterizing the crux of government witnesses' testimony. A review of the record indicates that the prosecutor's questions were generally supported by the previously elicited testimony. In sum, the prosecutor's method of questioning Weiss, though confrontational and abrasive, fell short of depriving Weiss of a fair trial.

### 2. The Prosecutor's Summation

■ In his opening statement, the prosecutor told the jury that the case read like a book. At the start of his summation, the prosecutor referred back to the book, saying:

I didn't tell you the title of that particular book that was going to be presented to you. I'm sure by now you know the title to that book, and the title to that book is called *the Merchant of Franklin*

*Square* and not New Jersey, and not Ohio and not 8600 West Bryn Mawr, Chicago.

(emphasis added). Subsequently, the prosecutor referred to the "merchants of Franklin Square," and the "merchants of greed, deceit and corruption." According to Weiss and *amicus curiae* Agudath Israel of America, those statements were intended to allude to Shakespeare's *The Merchant of Venice*, a play that has long served to perpetuate negative stereotypes about the Jewish people by virtue of its memorable villain, Shylock, whose insistence on exacting his pound of flesh "has become a metaphor for cruel and relentless greed." Bronstein, *Shakespeare, The Jews, and The Merchant of Venice*, 20 Shakespeare Quarterly 3 (1969). The prosecutor's allusions to *The Merchant of Venice*, coupled with his repeated references to wealth and greed, allegedly evoked the stereotype of Jews exemplified by Shylock, and improperly suggested that Weiss acted in accordance with this stereotype, thereby infusing the trial with anti–Semitic prejudice and making a new trial necessary.

We have stated that, at least "when the evidence of guilt ... is not overwhelming," the correct test for determining whether a defendant's due process rights were violated by a prosecutor's racially prejudicial remarks is whether those remarks resulted in a "probability of prejudice." *United States ex rel. Haynes v. McKendrick*, 481 F.2d 152 (2d Cir.1973). We have also noted that "[e]ven a reference that is not derogatory may carry impermissible connotations, or may trigger prejudiced responses in the listeners that the speaker might neither have predicted nor intended." *McFarland v. Smith*, 611 F.2d 414, 417 (2d Cir.1979). Here, we believe that the prosecutor's summation did not result in a "probability of prejudice," even at the subliminal level described in *McFarland*. The challenged statements allude to *The Merchant of Venice* only obliquely, and even if they could have triggered some connection with that play, they could not have triggered a prejudiced response unless the listener made a further connection with the play's anti-Semitic overtones.[4] Any possibility of taint is further attenuated by the fact that the statements allude only to the title of the play and to its title character, Antonio, and not to Shylock, the villainous Jew.

Prosecutors, as representatives of the government and of the people, should be particularly sensitive to even the slightest suggestion of bias or prejudice. They should choose their words with great care, avoiding phrases that might tend to influence the listener improperly. *See Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). The prosecutor in this action could have chosen his words more carefully. However, we do not believe that he overstepped the bounds of proper argument. We have already held that the challenged remarks were not improper with respect to PMSC. *See Weiss*, 914 F.2d at 1525. Having conducted an independent review of the summation, and having fully considered the brief submitted by *amicus*, we now extend this holding to Weiss.[5]

---

4. This case is therefore distinguishable from *Commonwealth v. Graziano*, 368 Mass. 325, 331 N.E.2d 808, 812–13 (1975), in which the Supreme Judicial Court of Massachusetts overturned the conviction of two Italian defendants in part because the prosecutor evoked their national origins by alluding in summation to Mario Puzo's *The Godfather*. In that case, the allusions were unmistakable, *see, e.g., id.*, 331 N.E.2d at 812 (" 'We've even got the godfather in this case. The godfather, we've got the wedding, we've got every party [sic] of it.' "), and, in addition, the prosecutor made other more direct references to defendants' ethnicity, *see, e.g., id.* (prosecutor remarked that defense witnesses "[a]ll come from Italy" and made repeated references to Al Capone).

5. Because we are satisfied that the challenged statements do not rise to the level of a constitutional error, we need not address the question left open in *Haynes*—whether harmless error analysis should apply where a prosecutor improperly injects racial considerations into a case. *See Haynes*, 481 F.2d at 161 (suggesting that prosecutorial appeals to racial prejudice should constitute automatic grounds for reversal); *see also Miller v. State of North Carolina*, 583 F.2d 701, 708 (4th Cir.1978) (holding that appeals to racial prejudice require automatic reversal); *Weddington v. State*, 545 A.2d 607, 614–15 (Del.1988) (same); *Developments in the Law—Race and the Criminal Process*, 101 Harv. L.Rev. 1472, 1594–95 (1988) (arguing that racially prejudicial prosecutorial conduct warrants

■ In a separate challenge to the government's summation, Weiss argues that the prosecutor impermissibly appealed to class bias by stressing the defendants' profit motive and repeatedly referring to defendants Health–Med and PMSC as "multi-million dollar corporations." The claim is that these remarks constitute prejudicial error under *United States v. Stahl*, 616 F.2d 30 (2d Cir.1980), in which we held that the prosecutor's repeated references to defendant's greed and "Park Avenue offices" warranted reversal of the conviction. *Stahl*, however, involved conduct far more egregious than that involved here. In *Stahl*, the prosecutor's basic trial strategy was to arouse prejudice against the defendant because of his wealth, and the improper references to defendant's wealth were constant and deliberate. *Id.* at 32–33. In addition, the prosecutor in *Stahl* made repeated statements during the trial that were not supported by the evidence. *Id.* at 32. These elements were not present here. *Cf. United States v. Little*, 753 F.2d 1420 (9th Cir.1985) (distinguishing *Stahl* where prosecutor made only two isolated references to money and greed). Thus, while the statements to which Weiss objects may have been "undignified and intemperate," *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 239, 60 S.Ct. 811, 852, 84 L.Ed. 1129 (1940), we do not believe that they could have so influenced the minds of the jurors as to deprive Weiss of a fair trial. *Accord Weiss*, 914 F.2d at 1524.

### D. *Court Interference with Defense Cross–Examination*

Weiss asserts that the court improperly precluded defense counsel from cross-examining witnesses on crucial elements of credibility and substance. In particular, Weiss claims his counsel was not given appropriate latitude or opportunity to expose the animosity of prosecution witnesses toward Mr. Weiss, that animosity allegedly being the underlying motive for the witnesses' testimony.

■ The court has broad discretion in making evidentiary rulings at trial. *Alford v. United States*, 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931); *United States v. Singh*, 628 F.2d 758, 763 (2d Cir.), *cert. denied*, 449 U.S. 1034, 101 S.Ct. 609, 66 L.Ed.2d 496 (1980). "[T]he scope and extent of cross-examination are generally within the sound discretion of the trial court." *United States v. Pedroza*, 750 F.2d 187, 195 (2d Cir.1984). The Sixth Amendment guarantees an accused the right "to be confronted with the witnesses against him," and the right to cross-examination has been held to be an essential purpose of the Confrontation Clause. *Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 1109, 39 L.Ed.2d 347 (1974). The defendant should be given wide latitude in cross-examining a government witness in a criminal case. *Pedroza*, 750 F.2d at 195.

■ The Federal Rules of Evidence do not expressly deal with the concept of impeaching a witness for bias, but the Rules clearly contemplate impeachment of this nature. *United States v. Abel*, 469 U.S. 45, 49–51, 105 S.Ct. 465, 467–69, 83 L.Ed.2d 450 (1984). "[A] defendant should be afforded the opportunity to present facts which, if believed, could lead to the conclusion that a witness who has testified against him either favored the prosecution or was hostile to the defendant." *United States v. Haggett*, 438 F.2d 396, 399 (2d Cir.), *cert. denied*, 402 U.S. 946, 91 S.Ct. 1638, 29 L.Ed.2d 115 (1971). A witness' hostility may be proved by any competent evidence, *id.* at 400, even extrinsic evidence, although a foundation in the form of a preliminary question is often required. *United States v. Harvey*, 547 F.2d 720, 722 (2d Cir.1976). "[W]hen the main circumstances from which bias proceeds have been proven, the trial judge has discretion to determine how far the details, whether on cross-examination or by other witness, may be allowed to be brought out." E. Cleary, *McCormick on Evidence* § 40, at 88 (3d ed. 1984). Moreover, if the proba-

automatic reversal because it taints the entire trial proceeding, rendering the effect of the violation impossible to ascertain); Note, *Arguments Appealing to Racial Prejudice: Uncertainty, Impartiality, and the Harmless Error Doctrine,* 64 Ind.L.J. 375, 385 (1989) (same).

tive value of evidence is outweighed by the unfair prejudice that might result from its introduction, it should not be admitted. *United States v. Birney,* 686 F.2d 102, 106 (2d Cir.1982); *see* Fed.R.Evid. 403. When the district court has performed this balancing, we will not overturn the decision unless the district court abused its discretion or acted arbitrarily and irrationally. *Pedroza,* 750 F.2d at 201. After examining the record and the arguments raised, Weiss has failed to show that the district court abused its discretion. If error was committed, it was harmless. We are satisfied that it did not substantially influence the jury. *Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557 (1946).

■ Taking Weiss' complaints one by one, we can ascertain that his grievances lack merit. The district court permitted Weiss to elicit from PMSC comptroller Pontillo testimony that Pontillo had animosity toward Weiss and had punched a hole in a wall out of anger at Weiss. Further questioning on the same issue was precluded. While the court's basis for cutting off the questioning was not spelled out in the record, there were plausible and, indeed, acceptable reasons for the exclusion under Rule 403. The evidence would have had minimal probative value because it was cumulative, and its admission would have required unnecessary delay. Evidence of Pontillo's relationships with other members of the PMSC staff was also excludable as cumulative and dilatory. Excluding the testimony did not harm the policy encouraging the admission of evidence related to bias because the witness admitted to the main circumstances from which any bias supposedly arose. *McCormick on Evidence, supra,* § 40, at 88. All the relevant information was obtained and there is no evidence that the testimony would have added anything of probative value.

In support of his contention that his cross-examination of Pontillo was improperly limited, Weiss relies on *Pedroza,* 750 F.2d 187, where a defendant was precluded from cross-examining the father of a kidnap victim on whether he had in fact voluntarily placed the child in the custody of the defendants. A focal point of *Pedroza* was the father's role in the kidnapping, an issue delved into on the government's direct examination of the father. Impeding cross-examination of the victim's father in *Pedroza* violated the principle that cross-examination must be permitted if a matter was raised on direct examination. *United States v. Segal,* 534 F.2d 578, 582 (2d Cir. 1976).

Unlike *Pedroza,* the government in this case did not question its witnesses on their motivation for testifying. Thus, *Segal* is distinguishable. Also unlike *Pedroza,* the information sought by Weiss did not go to the heart of the action, or one of the elements of Weiss' crime, but instead only dealt with the witnesses' credibility and motives. Also, unlike *Pedroza,* the prosecution in summation here did not stress the issue of the government witnesses' lack of motive to alter their testimony against Weiss. *See Pedroza,* 750 F.2d at 196–97. Weiss has made no showing that this evidentiary ruling fell outside the discretion of the district court.

■ Weiss objects to the documents excluded by the court concerning Ms. Estee Weisz's unemployment insurance application, which Weiss may have wanted in evidence to substantiate his claim of bias on the part of the witness. Weiss' counsel withdrew his objection to the exclusion of documentary evidence related to the cross-examination of Ms. Weisz upon learning that he could examine Weisz on the substance of the documents without resorting to the documents themselves. Thus Weiss waived his right to appeal this matter. Even if an appeal had been preserved, however, Weiss' claim would still be unsuccessful on the merits. Weiss' counsel cross-examined Estee Weisz and she acknowledged her interception and diversion of equipment orders for her own benefit, Weiss' discovery of her perfidious conduct, and her subsequent involuntary termination from her employment at PMSC. Weisz also acknowledged that Weiss subsequently opposed her application for unemployment insurance. The court had discretion to ex-

clude further proof of these incidents through documentary evidence because Weisz had admitted to the incidents from which any alleged bias against Weiss arose. The document would have been merely cumulative evidence and any error in the court's exclusion on the grounds of Fed.R.Crim.P. 16(b) therefore was harmless.

 Weiss also unsuccessfully attempted to introduce into evidence Weisz's life insurance application. Weiss, again, has no grounds for an appeal on this issue because his trial counsel withdrew his objection to the exclusion upon learning that he was free to cross-examine Weisz on the substance of the document. Had an appeal been preserved, however, Fed.R.Evid. 608(b) expressly precludes the use of extrinsic evidence to prove specific instances of misconduct such as that at issue in the life insurance application. Defense counsel had the opportunity to question Weisz about the substance of the application but chose not to. There was no error in the court's exclusion of the document.

 Cross-examination of Uhlenburg resulted in the exclusion of a memo that was later admitted when Weiss was on the witness stand. While Weiss claims the exclusion was error, the subsequent admission of the evidence and the opportunity available to defense counsel to tie that evidence to Uhlenburg's testimony abrogates any error that may have been caused by the earlier exclusion absent a showing of prejudice. Weiss has made no showing of prejudice; the claims of diminished impact are purely speculative, particularly since defense counsel had the opportunity to question Uhlenburg about the substance of the memo.

Weiss next avers that his substantive cross-examination of government witnesses was hampered. Weiss contends he was not permitted to elicit testimony from witnesses concerning confusion in the industry about "point of sale" requirements. Weiss, however, was permitted to question the witnesses on their understanding of the meaning of the point of sale requirements. Contrary to defendant's assertion that the evidence was excluded as being beyond the indictment, much of the evidence was beyond the knowledge of the witness. Furthermore, Weiss attempted to establish confusion in the industry, but tried to show confusion in 1980, a period unrelated in time to the offenses committed. Weiss did not offer evidence of confusion in the industry at the time of Weiss' fraud or at the time of the trial.

### E. *Interference with Presentation of Evidence*

 Certified mail receipts were located in a warehouse on the morning of Friday, May 12, 1989. The government had been asking for the documents that were discovered since well before commencement of trial, and the court, at an earlier date in the trial, had informed the defense that if the documents were not produced immediately they would not be admitted. Defense counsel planned to use the documents in their case-in-chief and was obliged to disclose the documents under Rule 16(b). The court ultimately precluded use of the certified mail receipts because although the documents were found on Friday morning, it was not until Monday, May 15, in the middle of trial, that the defense informed the prosecution of the discovery. The government had already rested its case and the relevant government witnesses who could have provided information about the documents were out of state. Permitting the defense to use the documents, particularly without the prosecution ever having seen them and despite the earlier government requests for those documents, would have given the defense an unfair advantage. Exclusion of the evidence, therefore, was not an abuse of discretion.

 The court did not permit Weiss, while on the stand, to testify whether he intended to commit a crime. Intent to commit a crime is not relevant to intent to commit the acts that constituted the crimes. Weiss' intent or lack of intent to commit a crime is not dispositive of any element of the charges against Weiss. The exclusion, therefore, was not clearly erroneous.

On December 20, 1990 Weiss filed a motion requesting permission to file a supplemental brief, raising an additional issue on appeal. Permission was granted on January 3, 1991. Weiss alleges, for the first time, that the magistrate's supervision of jury selection was unconstitutional in light of the Supreme Court's recent decision invalidating the practice. *See United States v. Gomez*, 490 U.S. 858, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989). "To sustain the contention, however, a defendant must 'object to the selection of the jury by a magistrate.'" *Weiss*, 914 F.2d at 1526 (quoting *United States v. Mang Sun Wong*, 884 F.2d 1537, 1545 (2d Cir.1989)); *see United States v. Musacchia*, 900 F.2d 493 (2d Cir.1990). Weiss concedes that he did not object at trial; thus Weiss waived his right to reversal on this issue on appeal.

Weiss' supplemental brief contended that the Supreme Court's decision in *United States v. France*, 886 F.2d 223 (9th Cir. 1989), *cert. granted*, —— U.S. ——, 110 S.Ct. 1921, 109 L.Ed.2d 285 (1990), which held that a federal magistrate's supervision of jury selection in a felony trial is reversible error despite lack of objection to such procedure, should dictate the Second Circuit's position on this matter.[6] On January 22, 1991 the Supreme Court affirmed, by an equally divided court, the Ninth Circuit's decision in *France*. —— U.S. ——, 111 S.Ct. 805, 112 L.Ed.2d 836 (1991) (per curiam).[7] Because "an affirmance by an equally divided Court has no precedential effect in other cases," 12 *Moore's Federal Practice* ¶ 400.05–3 (1990) (citing *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)), the law of this Circuit is unaffected by the Supreme Court's decision in *France*.

The Supreme Court recently granted *certiorari* in *Peretz v. United States*, —— U.S. ——, 111 S.Ct. 781, 112 L.Ed.2d 844 (1991). The decision below, 904 F.2d 34 (2d Cir. 1990), was published without opinion and there was no published opinion from the trial court, the United States District Court for the Southern District of New York. *Peretz* questions a magistrate's authority to conduct jury selection and whether a federal felony defendant waives the personal right to a trial before a court with proper jurisdiction by failing to object to jury selection managed by a magistrate.

While it is clear that the Supreme Court intends to establish a definitive rule on magistrate jury selection, it is unclear when that decision will be made and what the decision will be. Because of this indefinite wait and because of the several other issues raised on this appeal, we believe that our decision on Weiss' appeal should not be delayed pending that Supreme Court action.

For the foregoing reasons, the judgment of conviction entered by the district court is affirmed.

RESTANI, Judge:

I dissent. I do not agree with the majority's conclusions as to the false statement counts of the indictment. I also disagree as to the effect of allusions to ethnic stereotypes.

As the majority points out, defendant relies on *Bronston v. United States*, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973) (evasive, but literally true, statement does not warrant perjury conviction) for the proposition that a conviction on false statement counts cannot stand if premised upon literally true statements. *Bronston* has been applied to other offenses involving false statements. *See, e.g., United States v. Poutre*, 646 F.2d 685 (1st Cir. 1980). Similar reasoning has also been applied to a false statement/false representation statute in this Circuit. *See United States v. Diogo*, 320 F.2d 898 (2d Cir.1963) (Sham marriage nonetheless a marriage for false statement purposes). This Circuit, however, requires that literal truth be

---

**6.** The central issue in *France* was whether, in the absence of defense objections at trial, magistrates are prohibited from conducting jury selection in felony trials. *France*, 886 F.2d 223 (9th Cir.1989).

**7.** Justice Souter took no part in the decision.

judged in context. *United States v. Schafrick*, 871 F.2d 300, 303–04 (2d Cir.1989).

In discussing the false statement counts, the majority states that "[t]he evidence in this case shows that the point of sale address was required in Box 31 of Form 1500." At 192. While I agree that the evidence shows that the point of sale address was what was sought by the form drafters, what was specifically requested in Box 31 of Form 1500 was simply an office address of the supplier. Form 1500 did not specify "point of sale." In its discussion of the fraud counts, the majority answers Weiss's argument that the Manual applies only to carriers by stating that the point of sale address is required by Form 1500, and that "[t]he Manual, therefore, is not the basis for this prosecution." At 194 (*citing Weiss*, 914 F.2d at 1521). The majority apparently used the same reasoning, that the Manual simply explained the proper address to be furnished on the Form 1500, for its finding that Weiss was properly convicted on the false statement counts. In failing to address completely Weiss's arguments, which go beyond those presented previously by Gleicher and PMSC, the majority has applied the reasoning upholding the convictions of the other two defendants instead of using the reasoning which this court should employ in determining whether the defendant before us on this appeal may succeed by arguing new issues.

In the previous appeal, defendant Gleicher argued that the court could not rely on the Manual to convict him because, at the time in question, it had not been approved by the Office of Management and Budget. Alternatively, Gleicher argued that the relevant portions of the Manual did not cover Box 31 of Form 1500.[1] It must also be noted that Gleicher argued exclusively that the Manual could not be used as a basis for conviction for *fraud*. This makes sense, for if the Manual could not be a basis for a fraud conviction, by implication it could not be a basis for a false statements conviction. This reasoning does not work both ways, however. The court could uphold the con-

victions as to fraud while finding that defendants had made not actual "false statements." This is because "[i]t is well settled that to establish such a scheme [to defraud], it is not necessary that there should be actual misrepresentation of an existing fact. It is sufficient if the proposed venture be presented in such a way as is calculated to carry out the intent to deceive." *Fournier v. United States*, 58 F.2d 3, 5 (7th Cir.) *cert. denied*, 286 U.S. 565, 52 S.Ct. 647, 76 L.Ed. 1297 (1932). For instance, "the deceitful concealment of material facts can be considered actual fraud ..." *United States v. Bush*, 522 F.2d 641, 651 (7th Cir.1975), *cert. denied*, 424 U.S. 977, 96 S.Ct. 1484, 47 L.Ed.2d 748, *reh'g denied*, 425 U.S. 986, 96 S.Ct. 2194, 48 L.Ed.2d 811 (1976). Weiss was familiar with the Manual, knew that the Secretary obligated the carriers to determine the point of sale and took steps to conceal the point of sale. Barring other problems, Weiss's fraud conviction could stand because "[t]he aspect of the scheme to 'defraud' is measured by a nontechnical standard. It is a reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society." *Gregory v. United States*, 253 F.2d 104, 109 (5th Cir. 1958).

The determination of whether or not a defendant has made a false statement is largely "technical." One cannot be convicted of having made a false statement if the statement was literally true. *Bronston, supra.* Defendant's knowledge of the Manual does not create a context which renders an otherwise literally true statement false. *Compare Schafrick, supra.* By its own terms, "[t]he Medicare Carriers Manual provides the practical operating instructions needed by the contractors responsible for administration of the Supplementary Medical Insurance Program—Part B of Medicare." Appendix at 79. Moreover, "[t]his manual was not promulgated as a rule; it was no more than an informal

---

1. PMSC adopted Gleicher's arguments and also argued that we should overturn its conviction due to alleged prosecutorial misconduct.

interpretation of existing statutes and regulations." *Avol v. Secretary of Health and Human Services,* 883 F.2d 659, 661 (9th Cir.1989). The Secretary of Health and Human Services publishes manuals for carriers who are contractually bound to follow their provisions. "[T]hese provisions are designed to put carriers, not practitioners [those participating in the Medicare program], on notice." *Glick v. Secretary of the Department of Health and Human Services,* 714 F.Supp. 39, 41 (D.Mass.1989) (Carrier erred in determining that practitioner had received overpayments on the basis that he had failed to provide documentation, allegedly required by the Carriers Manual, of the services which he performed). As the government successfully argued in *Melashenko v. Bowen,* No. CV–P–87–533, 1990 WL 159905 (E.D.Calif. June 19, 1990)[2], the manuals create no rights of due process in third parties, i.e., suppliers of medical services, *assuming arguendo* that the manuals could be read as mandating procedures. Like another such manual, the Claims Manual (produced by the Social Security Administration), "[i]t has no legal force, and does not bind" the Secretary. *Schweiker v. Hansen,* 450 U.S. 785, 789, 101 S.Ct. 1468, 1471, 67 L.Ed.2d 685 (per curiam), *reh'g denied,* 451 U.S. 1032, 101 S.Ct. 3023, 69 L.Ed.2d 401 (1981). No more can it bind Weiss in filling out government forms for false statement purposes. Box 31 of Form 1500 required Weiss to put down the corporation's address. If what Weiss inserted was literally true, the court erred in upholding his false statement convictions merely because the non-binding Manual called for the particular office at the point of sale.

I do not believe, however, that the false statement counts should be dismissed. For Weiss's statements to be literally true, the corporation must have had real offices, and not merely sham ones, at the addresses provided. Counts Eight through Ten of the Indictment deal with the allegedly false statements regarding the Illinois address. It appears that the corporation may have had a real sales office there. Counts Eleven through Sixteen of the Indictment deal with the false statements regarding the Ohio address. The evidence indicates that this was the address of a full-time mother of eight who had sold a few products for defendants. That this could be called a true office is unlikely. Counts Seventeen and Eighteen deal with the false statements regarding the New Jersey address, where the corporation maintained a warehouse. This is a middle case. For false statement purposes, the trial judge should have instructed the jury to decide, independently of the Manual, whether the defendants maintained an actual office at each of these locations. I would vacate Weiss's conviction on counts Eight through Ten, Counts Twelve through Sixteen and Count Eighteen and remand for a new trial to address the question of whether the corporation's various offices were real or sham, for purposes of the false statement counts.[3]

Of even greater concern to me, however, is the majority's finding that the prosecutor's opening and summation did not improperly invoke religious or ethnic prejudice.[4] I conclude that the majority has failed to apply *United States ex rel. Haynes v. McKendrick,* 481 F.2d 152 (2d Cir.1973), properly.[5] According to *Haynes,* once the court determines that the prosecutor has made improper racial remarks, we

---

**2.** In *Melashenko,* a doctor claimed that he had been improperly excluded from the Medicare program. He contended, *inter alia,* that the manuals gave him procedural rights.

**3.** Weiss was acquitted on Counts Eleven and Seventeen.

**4.** Although the prosecutor's conduct did not warrant reversal in the prior *Weiss* decision, in that case the court was faced with a defendant which indicated it was not bothered by the

improper allusion. *Weiss* 914 F.2d at 1525. Furthermore, the issue of whether the Carriers Manual created obligations as to third parties for false statement purposes was not presented directly.

**5.** Because I find reversal is necessitated by negative comments as to ethnicity, I do not examine the precise effect of invocation of class prejudice in this case. *See United States v. Stahl,* 616 F.2d 30 (2d Cir.1980).

must determine whether there was a *probability* of prejudice. *Id.* at 159. The court did not state that this was the proper test for all cases, and as noted by the majority it expressly left open the question of "whether jury verdicts tainted by racially prejudicial statements by the prosecutor should be measured by the harmless error test, but rather should receive automatic reversal." *Id.* at 161.

Again, in this case the majority does not decide this issue because of its finding that the remarks alluding to ethnic stereotypes were not improper. I disagree, the context of the remarks, from the opening statement likening the trial to a book, through the repeated references to greed, to the summation wherein the title of the book is revealed, seem calculated to raise prejudice. The trial court, however, apparently did not perceive a malicious intent and there is a possibility that the offensive remarks were simply ill-considered. But regardless of the prosecutor's intent we must have concern for what message the jury received. That is the essence of *Haynes*. The court gave no curative instruction nor did it examine the jury on this point either before or after receipt of the verdict.[6] Although such steps raise other problems, in their absence we must assume that a prejudicial message was received.

I am not dissuaded from this conclusion by the fact that the title of Shakespeare's play refers to the good Antonio and not to the greedy, if redeemed, Shylock. I doubt that many people who have not read *The Merchant of Venice* recently are familiar with Antonio. The problem is not one of literary analysis but of a common negative stereotype. Shylock, a dominant figure in *The Merchant of Venice*, is a negative stereotype, all too familiar to those who have never read the Bard or even to those whose last passing acquaintance with him was as high school sophomores.

As noted in *Haynes*, when racial prejudice is involved, "[m]ore than just harm to the individual defendant is involved ..."

*Haynes*, 481 F.2d at 157. Moreover, "[r]acially prejudicial remarks are ... so likely to prevent the jury from deciding a case in an impartial manner and so difficult, if not impossible, to correct once introduced, that a good argument for applying a more absolute standard may be made." *Id.* at 161. Prejudicial ethnic and religious remarks should face similar treatment. Nonetheless, in *United States v. Modica*, 663 F.2d 1173 (2d Cir.1981), *cert. denied*, 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982) (prosecutor's improper summation vouching for the credibility of its witness not reversible error because the summation remarks were the only improper behavior that occurred and the prosecution had an overwhelming case), the court expressed its frustration when confronted by non-prejudicial prosecutorial misconduct, because of reluctance to reverse justly decided cases.

Here a less than absolute standard should not bar reversal. As indicated, the probability that the jury received a message of ethnic and religious bias exists and error was made as to the false statement counts. The error in placing the Carrier Manual in its proper place with regard to the false statement counts may also have infected the other charges. Intent is crucial, and I would not categorize the evidence as overwhelming. Because of the combination of errors, I would reverse conviction on all counts against Weiss and remand for a new trial.

---

6. In this situation, it is likely that examination of the jurors would violate Rule 606, Federal Rules of Evidence.