Steve BUTCHER, Rick Beams, Glen Boatright, Individually and as Representative Members of Local 2284, International Association of Fire Fighters, and Local 2284, International Association of Fire Fighters, a Public Employee Union, Plaintiffs–Appellees,

v.

CITY OF McALESTER, a Municipal corporation, Defendant–Appellant.

No. 90–7041.

United States Court of Appeals, Tenth Circuit.

Feb. 12, 1992.

---

Charles S. Plumb (Lynn Paul Mattson and Michael C. Redman of Doerner, Stuart, Saunders, Daniel & Anderson, with him on the brief), Tulsa, Okl., for defendant-appellant.

Ronald E. Hignight (Gary L. Richardson of Richardson, Meier & Associates, with him on the brief), Tulsa, Okl., for plaintiffs-appellees.

Before BALDOCK AND McWILLIAMS, Circuit Judges, and DUMBAULD, District Judge.*

McWILLIAMS, Circuit Judge.

Pursuant to 42 U.S.C. § 1983, Steve Butcher, Rick Beams, and Glen Boatright, individually and as representative members of Local 2284, International Association of Fire Fighters, brought suit in the United States District Court for the Eastern District of Oklahoma against the City of McAlester, State of Oklahoma, Randy Green, the City Manager for McAlester, Larry Ketchum, the Fire Chief for McAlester, and Fred Sanders, the former Fire Chief for McAlester. The gist of the complaint was that the defendants acting under the color of state and municipal law, custom or usage conspired to violate plaintiffs' first amendment right to peaceably assemble by prohibiting, interfering with and subverting their right to participate in the activities of Local 2284.

More specifically, plaintiffs alleged in their complaint as follows: (1) that the defendants singled out the individual plaintiffs, who were firemen for the City and members of the Local, and without good cause subjected them to numerous adverse personnel actions for the sole purpose of discouraging them and others from holding office in Local 2284 and from otherwise participating in the Local's activities; (2) that defendants threatened the Local's members with adverse personnel action if they assumed office in Local 2284; (3) that the defendants, cognizant that the Local was without sufficient funds to fully defend against adverse personnel actions, made frivolous changes to personnel benefits thus causing the Local to file grievances, and that thereafter the defendants prolonged and delayed grievance procedures for the purpose of exhausting and

---

* Honorable Edward Dumbauld, United States District Judge for the Western District of Pennsylvania, sitting by designation, heard oral argument in this case but does not participate in the Opinion. In this regard, see 28 U.S.C. § 46(d).

depleting the Local's treasury; and (4) that the defendants in an effort to discourage union membership and activity promoted non-union firemen ahead of the Local's members without regard to qualifications.

Butcher, Beams, and Boatright each sought $200,000 for "damages to their estate and income, reputation within the community and [for] mental pain, suffering and anguish." Local 2284 asked for damages in excess of $30,000 for expense incurred in prosecuting and defending grievances involving Butcher, Beams, and Boatright and other members of the Local. Plaintiffs also asked for punitive damages in the sum of $500,000.

By stipulation the plaintiffs later dismissed without prejudice their claim against Randy Green, the City Manager, Larry Ketchum, the Fire Chief, and Fred Sanders, the former Fire Chief. Although the answer of the City is not a part of the record on appeal, the City denied liability and a jury trial ensued. The jury returned verdicts in favor of all plaintiffs and against the City and fixed damages as follows: (1) Butcher's so-called economic loss at $40,000, mental pain and anguish at $15,-000, and, as a separate item, humiliation at $15,000, for a total of $70,000; (2) Beams' economic loss at $40,000, mental pain and anguish at $15,000, humiliation at $15,000, for a total of $70,000; (3) Boatright's economic loss at $10,000, mental pain and anguish at $15,000, humiliation at $15,000, for a total of $40,000; and (4) Local 2284's economic loss at $34,000.

Plaintiffs' claim for punitive damages was not submitted to the jury. In this regard, plaintiffs confessed defendant's motion for summary judgment with respect to their claim for punitive damages, and accordingly, the court granted summary judgment for defendants on the issue of punitive damages.[1]

After judgments in conformity with the jury's verdicts were entered, the City timely filed an "Alternative Motion for Judgment Notwithstanding the Verdict, for New Trial and for Remittitur." The motion itself set forth no grounds for granting the relief sought, but did state that the motion was based on the "reasoning and authority" set forth in a brief filed contemporaneously with the filing of the motion.

In the supporting brief, the City advanced three reasons why judgment notwithstanding the verdict, or a new trial or remittitur, should be entered in its favor. The first reason was framed as follows: "The jury finding that the City of McAlester adopted a custom or policy of retaliation against the three named plaintiffs and the Union was incorrect." Under that heading, the City argued that in a proceeding under 42 U.S.C. § 1983 it was not responsible under any theory for the acts of Sanders or Ketchum, and that although it was responsible for the acts of Randy Green, the City Manager, the plaintiffs' evidence did not show that Green himself violated 42 U.S.C. § 1983.

The second reason for granting the City judgment notwithstanding the verdict, or a new trial or remittitur, was framed as follows: "Plaintiffs' dismissal of the individual defendants ... operates to preclude any finding of liability against the municipal defendant." As indicated, by stipulation the individual defendants Green, Sanders and Ketchum were dismissed without prejudice from both the initial and an amended complaint. The City does not urge this particular matter on appeal.

The third and last reason given in the supporting brief was that the damage instructions were not "tailored to the constitutional tort at issue," permitted "speculation," and the awards made were "excessive and unreasonable."

The district court denied the City's motion for judgment notwithstanding the verdict, or for new trial or remittitur, and the City now appeals the district court's denial of that motion, as well as the judgments entered.

On appeal, the City asserts that the district court erred in denying its alternative motion for judgment notwithstanding the

---

1. A municipality is not liable for punitive damages in a proceeding under 42 U.S.C. § 1983.

*Wulf v. City of Wichita,* 883 F.2d 842 (10th Cir.1989).

verdict, or for new trial or remittitur, and in support thereof urges four matters: (1) liability against the City cannot be sustained; (2) plaintiffs' claims do not rise to the level of a constitutional tort under 42 U.S.C. § 1983, particularly in light of co-extensive and adequate state remedies; (3) correct application of the Pickering test precludes any recovery from the City; and (4) the damages awarded plaintiffs by the jury are excessive and not supported by the record. We shall discuss each ground *seriatim*.

### I. Liability against the City cannot be sustained

▇▇▇▇ Under this heading the City argues that although the plaintiffs may have established that the former firechief, Sanders, violated their constitutional rights, under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978), a municipality cannot be held liable on a theory of *respondeat superior* in a § 1983 proceeding for the tort of an employee. Hence, according to the City, Sanders' actions, he being a mere employee of the City, cannot form the basis for a judgment against the City. In this regard, the City concedes, however, that, under *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986), a municipality may be held liable in a § 1983 proceeding for acts of its employees which the municipal employer, through its final policymaking authority, has officially sanctioned or ordered.[2] Accordingly, the City argues that in a § 1983 proceeding it is liable for the actions of Randy Green, the City Manager, but, as indicated, is not liable for the acts of Fred Sanders, the former firechief. As concerns Randy Green, the City argues that the plaintiffs' evidence is insufficient to show impermissible action or motive on the part of Green. Some background facts are in order.

Local 2284 was the collective bargaining unit for the City's firefighters and there was a collective bargaining agreement between the Local and the City. Periodically, the Local and the City would negotiate an updated collective bargaining agreement. The agreement set forth the rights of the individual firefighters and the City, and provided for grievance procedures and the like. Butcher, Beams, and Boatright, firefighters for the City, were members of the Local, and at varying times each had served as president of the Local.

Fred Sanders was the Chief of the City's Fire Department until his resignation in 1988.[3] Randy Green was the City Manager for McAlester. Sanders, as the fire chief, could recommend disciplinary action against an individual firefighter, which recommendation would then be reviewed and acted on by Green.

As we understand it, plaintiffs agree that their judgment against the City cannot be grounded, as such, upon the actions of Sanders, but contend that it can be, and is, grounded upon the actions of Green, who was himself guilty of impermissible acts and motives. The City apparently concedes that there is evidence that Sanders violated the provisions of 42 U.S.C. § 1983, but argues that there is insufficient evidence to show that Green did.

This was a protracted trial, lasting some eight days, with a great number of witness-

---

**2.** In other words, in a § 1983 proceeding the municipality must itself be at fault, and it is not, under *respondeat superior*, responsible for the isolated torts of its employees. However, in a § 1983 proceeding a municipality is liable for the acts of its "final policymaking authority" and may also be liable for the actions of an employee who is not a final policymaking authority if a widespread practice exists to the end that there is a "custom or usage with the force of law," or a final policymaker ratifies a subordinate's recommendation, and the basis for it, thus rendering a final decision chargeable to the

municipality. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 925, 99 L.Ed.2d 107 (1988). The foregoing has been recognized by us in *Wulf v. City of Wichita*, 883 F.2d 842, 868 (10th Cir.1989) and *Melton v. City of Oklahoma City*, 879 F.2d 706, 724 (10th Cir.1989), *rehearing en banc on other grounds*, 928 F.2d 920 (10th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 296, 116 L.Ed.2d 241 (1991).

**3.** A grand jury investigating Sanders' conduct declined to return any indictment, though it did recommend that he resign.

es and exhibits. The trial transcript consisted of some six volumes. Suffice it to say, there is ample evidence to show that Sanders and the Local and some of its members had a running battle for some four years. It was the plaintiffs' theory of the case that the City was trying to break the Local and discourage the firefighters from joining, or remaining in, the Local. There was evidence that the officers of the Local, including the individual plaintiffs, were singled out by Sanders and Green for spurious adverse personnel action in retaliation for their union representation, the defendants thereby seeking to discourage the rank and file members of the Union from holding union office or otherwise participating in the Local's activities.

In support of the foregoing observation, we note that Beams testified that he felt for sure Green was a part of the harassment and pressure during contract negotiations and that Green had told Beams the "nit-picking" grievances had to stop or the City would begin implementing changes in retaliation. Beams also testified that Green had threatened the fire fighters by relating the story of Boatright's brother, who had been fired by the City and was unemployed for one year before being reinstated, and cautioned that the fire fighters similarly could suffer one year without means to pay bills.

Boatright, also, testified concerning Green's threats. Boatright recounted that Green pressured him to resign from union office because the "heat was fixing to get turned up," and, later, if Boatright did not resign, that Green wanted nothing to do with him.

Butcher's testimony as well implicated direct action by Green. Butcher testified that Green threatened the fire fighters with the City's greater financial resources to engage in grievances. Butcher also testified that during contract negotiations Green told him that he could arrange eight-hour shifts, forcing the fire fighters to quit off-duty jobs.

In addition to evidence of direct actions by Green, the record also supports ratification by Green of Sander's actions.

Ratification requires that Green knew of and approved Sanders' actions and adopted Sanders' unconstitutional motive. The parties dispute exactly when Green became aware of problems between Sanders and the fire fighters. The City maintains Green was unaware until a confrontation in May 1987; Local 2284 claims Green was aware as early as 1985. That Green's awareness existed only after May 1987 is contradicted by the evidence. The totality of the personnel actions dating back a number of years and the ongoing multitude of grievances supports both Green's awareness and adoption of Sanders' motive. Testimony that Green conducted an independent investigation of personnel actions recommended by Sanders, at least after May 1987, did not sever the link between Green and Sanders and thereby insulate the City from liability. It was but one factor to be considered by the jury. The record as a whole conveys an intense emotional conflict between the City and Local 2284, sustained over time, which even carried over to dissension within Local 2284 itself. It is difficult to imagine that Green could not know that the personnel decisions presented for his approval were motivated to subvert Local 2284.

Without going into further detail, our reading of the record leads us to conclude that there is sufficient evidence to show that the City, through the conduct of Green, violated 42 U.S.C. § 1983. As indicated, there is some direct evidence of such and there is more circumstantial evidence of such. And of course, in a § 1983 proceeding circumstantial evidence generally plays a major role. Sanders reported to Green, and it was the latter who took all disciplinary action against individual fire-fighters. Sanders' office and Green's were "right down the hall," and they were in constant communication. The evidence is sufficient to show that Green shared, and participated in, Sanders' impermissible actions and motives.

II. Plaintiffs' claims do not rise to the level of a constitutional tort under § 1983

 Under this heading, the City argues that inasmuch as the collective bargaining

agreement between the parties contained grievance and arbitration procedures, and the state law of Oklahoma provided for unfair labor practice procedures, both of which were utilized by the plaintiffs, such forecloses a § 1983 proceeding. We do not agree. Counsel concedes that there is no duty on a plaintiff in a § 1983 proceeding to exhaust administrative remedies, citing *Patsy v. Board of Regents of State of Florida*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). We are not persuaded by *Carter v. Kurzejeski*, 706 F.2d 835 (8th Cir.1983), relied on by the City. *Carter* was not a § 1983 proceeding and involved federal employees subject to the Civil Service Reform Act of 1978, 5 U.S.C. § 7101, *et seq.* (CSRA). The Eighth Circuit in *Carter* did recognize the constitutionally protected right to join a union implied from the freedom of assembly clause in the first amendment. However, the holding in *Carter* simply was that the existence of a constitutional right did not automatically exempt a claim based on a violation of such right from the exclusivity of arbitral or administrative review procedures explicitly created by Congress in the comprehensive procedural scheme established by the CSRA. In that case, since the plaintiffs had not "exhausted" contractual and administrative remedies governed by the CSRA, the plaintiffs were not entitled to declaratory or injunctive relief from a federal court. The factual setting of *Carter* is far different from that of the instant case.

■ We reject any suggestion that since none of the three individual plaintiffs was discharged such forecloses any § 1983 proceeding, where, as here, there was evidence of adverse disciplinary action short of discharge.[4]

### III. Pickering

■ Counsel argues that under the "balancing test" enunciated in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), plaintiffs have no cause of action under 42 U.S.C. § 1983. Counsel suggests that plaintiffs' right to peaceably assemble, i.e., join and participate in union activity, is outweighed by the City's right to administer its labor contract, discipline employees, where necessary, and pursue collective bargaining objectives under Oklahoma's labor law system. We disagree. Of course the City has the right to make certain that the Local and the firefighters live up to, and abide by, the collective bargaining agreement then in effect, but that gives them no license, where there is a collective bargaining agreement, to embark on union-busting activities. *Pickering* does not require a reversal in the instant case.

In *Pickering* a school teacher was fired because he wrote a letter which was published in a local newspaper that was critical of the school board. The Illinois courts upheld the dismissal. On appeal, the Supreme Court reversed. In so doing, the Supreme Court observed that the local school board, as an employer, did have interests "in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of speech of the citizenry in general." In that setting, the Supreme Court commented as follows:

> The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

While the School Board in *Pickering* may well have had some legitimate employer interest in the speech making activities of its employees, we fail to see how, where there is a collective bargaining agreement between the parties, the City had any legitimate interest in whether its firefighters elected to join the union and participate in its activities, or stay out of the union. Ab-

---

**4.** In *Morfin v. Albuquerque Public Schools*, 906 F.2d 1434, 1437 n. 3 (10th Cir.1990), we recognized that adverse disciplinary action such as suspension or transfer made in retaliation for constitutionally protected conduct may give rise to a claim under 42 U.S.C. § 1983. *See also Allen v. Scribner*, 812 F.2d 426, 434 n. 16 (9th Cir.1987), *amended by*, 828 F.2d 1445 (9th Cir.1987).

sent any legitimate government interest to balance against Local 2284's assembly rights, union organization and participation was protected.

As stated above, the City admittedly had the right to insist that its firefighters comply with the collective bargaining agreement between the Local and the City, but such did not permit the City, where there was a collective bargaining agreement, to embark on a union-busting effort.

We believe our analysis of this particular matter is consistent with *Schalk v. Gallemore*, 906 F.2d 491 (10th Cir.1990) and *Wulf v. City of Wichita*, 883 F.2d 842 (10th Cir.1989).

### IV. Damages

As stated at the outset, the jury awarded Butcher $40,000 as so-called "economic loss," i.e., "loss of income and earnings, including lost wages and interest," $15,000 for "mental pain and anguish," and an additional $15,000 for "humiliation," making a total award of $70,000. The jury awarded Beams the same awards as were awarded Butcher. Boatright's economic loss was set at $10,000, his mental pain and anguish at $15,000, and his humiliation at $15,000, for a total award of $40,000. Local 2284 was awarded $34,000.

On appeal, the City argues that the damages awarded by the jury are excessive and that the various plaintiffs were entitled to only nominal damages at the most. In this connection, the individual plaintiffs generally claimed that they were denied promotions that they could have reasonably expected by the actions of Sanders which, under their theory, were joined in by Green. Also, Butcher and Beams claimed that their "second jobs," in Butcher's case a contract with the State of Oklahoma Department of Health to operate a "transitional living home," and in Beams' case, a claims adjuster, were adversely affected by defendant's actions.

■ More specifically, Beams testified to two demotions. The first occurred in December 1985 when Beams was demoted from Driver Operator to Fire Fighter for devoting too much time to outside activities. In February 1986, though not technically demoted from Fire Fighter, Beams was ordered to report as an assistant to the Fire Chief's secretary and perform clerical work in the office from 8:00 a.m. to 5:00 p.m. each weekday. After Beams filed a grievance and an unfair labor practice charge, and after intervention by the International Association of Fire Fighters, the City reinstated Beams to a 24-hour shift and, later, to a Driver/Operator position. The second demotion occurred in December 1987 when Beams was demoted from Driver/Operator to Fire Fighter for failure to submit to a polygraph by the City examiner. Beams also testified to lost secondary employment as an insurance adjuster, which he resigned as a result of problems in the Fire Department and could not continue for two years under a non-competition agreement that Beams believed was enforceable. At the end of the two years Beams attempted, unsuccessfully, to start his own claims business.

■ Boatright testified that he was suspended in January 1988 because he had purchased tires for his personal use at a discount by using a Fire Department purchase order number, provided at the invitation of Chief Sanders. The matter was forwarded to the District Attorney for investigation and criminal prosecution. Boatright testified that the City used the tire incident in an attempt to extort information from Boatright that could be used against Beams and Butcher. When Boatright refused, two suspensions were imposed: six weeks with pay during the investigation; and five days without pay as discipline, for which he forfeited five vacation days. Boatright also paid the difference on the tires. In addition to the suspensions, Boatright also testified to economic losses due to missed benefits of promotion because he was President of Local 2284.

■ As with Beams and Boatright, Butcher's economic losses were supported by testimony. Butcher was reprimanded for spearheading the May 1987 confrontation; suspended five days in July 1987 for

mishandling a hose at the Henson fire; demoted in September 1987 two ranks from Captain to Driver/Operator because of an incident at Dee's Uniform; refused renewal in June 1988 of his transitional living home contract with the State of Oklahoma, which Butcher had been operating since 1982; and suspended three days in January 1989 for undermanning a shift without prior approval. The transitional living home under the state contract was sufficiently linked to actions by the City. Green testified that in February 1988 he investigated Butcher's operation and prepared a report for the Mayor, specifically highlighting that Butcher received $112,000 annually under the contract, but the record is unclear what legitimate interest the City had in Butcher's contract with the State of Oklahoma. Green's inquiry into the state contract also followed closely upon escalating events in which Butcher actively participated: the May 1987 confrontation in which Butcher acted as spokesperson; documentation of the fire fighters' complaints against Sanders, which Butcher obtained and submitted to City Attorney Wes Brown; and convening of the Grand Jury, which Sanders pressured Butcher to stop and which issued a report in January 1988 recommending Sanders' resignation. Of the three individual plaintiffs, Butcher also appears to have succeeded to the highest rank in the Fire Department. Though the City presented evidence of an outside complaint which may have contributed to cancellation of Butcher's contract, the weight of that evidence was for the jury to decide. The record sufficiently supports the $40,000 in damages awarded Butcher for his economic losses.

■ As for mental pain and anguish, counsel for the City concedes that damages for mental pain and anguish are recoverable in a § 1983 proceeding, citing *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), but argues that the evidence of mental pain and anguish does not support the $15,000 award given to each of the three individual plaintiffs.

Mental pain and anguish are by their very nature difficult to prove with mathematical exactitude, but, again, we believe the record supports the awards made for mental pain and anguish. As was said in *Wulf v. City of Wichita*, 883 F.2d 842, 875 (10th Cir.1989), although the plaintiffs' evidence of mental anguish was not "the most graphic and detailed," nevertheless the court in that case went on to say that "we cannot conclude that *some* award for such anguish and distress is unsupported by substantial evidence" (emphasis in original). The foregoing fits the instant case. It is true that in *Wulf* we remanded the case for a recalculation of the award for mental anguish. But the award in *Wulf* for mental anguish was $250,000. The award in the instant case was a mere $15,000.

■ As a separate item of damage, the jury awarded the three individual plaintiffs $15,000 each for "humiliation." The City argues that it was error to instruct the jury that in addition to an award for "mental pain and anguish" the jury could also make an award for "humiliation," and that in any event there is insufficient evidence of so-called "humiliation."[5] In this regard, we note that the word "humiliation" does not appear in either the original complaint or the amended complaint, and that it does not appear in the pretrial order. Nor did Butcher, Beams or Boatright in their testimony even mention the word. From the record before us it is difficult to ascertain just when, and how, the "humiliation" aspect was injected into the case. Be that as it may, in our view the evidence of so-called "humiliation" on the part of Butcher, Beams and Boatright is simply insufficient to support any award. It is agreed that we are not here concerned with a "damaged reputation," as opposed to "humiliation." It would seem that ordinarily "humiliation" would be subsumed in "mental pain and anguish."[6] In any event, the evidence of humiliation on the part of either Butcher, Beams, or Boatright is insufficient to support a separate award for humiliation.

---

5. Our reading of the record does not support plaintiffs' suggestion that in the district court the City did not object to a separate instruction on humiliation.

6. In this connection, the present case is somewhat akin to *Sims v. Malcahy*, 902 F.2d 524, 532–33 (7th Cir.1990), where the Seventh Circuit held that the district court's refusal to give a

As concerns the jury's award of damages to the Local, the jury awarded $34,000 in actual damages for fees and costs incurred by the Local in arbitration and administrative proceedings with the City. Local 2284 had asked for damages in excess of $30,000 for attorneys' fees, arbitrators' fees, transcript costs, and travel expenses for Butcher, Beams and Boatright related to numerous grievances and unfair labor practice charges. Local 2284 asserted that these expenses resulted from the City's unilateral changes in employee benefits and policies, and spurious adverse personnel action, all at odds with the collective bargaining agreement. As a result, Local 2284 was forced to file grievances. In this regard, Butcher testified that Green told him, Beams and Boatright that the City had budgeted $40,000 to fight any grievances, that Green could get more money if needed, and that the fire fighters lacked such resources and so should give up. As to the amount, Beams testified that Local 2284 experienced a financial burden of $34,000 related to grievance arbitration. The City asserts that arbitration expense is not a proper item of damage in a § 1983 proceeding of this type. However, it was the plaintiffs' theory that this was not normal grievance expense, but that such expense resulted from, and was precipitated by, the City's desire to force the plaintiffs to file grievances by making frivolous and otherwise improper personnel changes. In any event, the jury has now resolved this matter and the damages awarded the Local are, in our view, supported by the record.

The judgments in favor of Butcher, Beams, and Boatright for $15,000 for humiliation are reversed and on remand the district court is directed to vacate those particular judgments. Otherwise, the judgments are affirmed.

---

separate instruction on "community humiliation" and "loss of reputation" was not error where the district court did give a proper instruction on "mental anguish" and "mental suffering" and the plaintiff's evidence was more properly considered within the latter categories than the former categories.