**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 22 2002**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ROBERT SCHNEIDER,

        Plaintiff - Appellee,

v.

CITY AND COUNTY OF DENVER, a
municipal corporation,

        Defendant - Appellant.

No. 01-1199
(D.C. No. 99-Z-504)
(D. Colorado)

---

**ORDER AND JUDGMENT**[*]

---

Before **HENRY** and **HOLLOWAY**, Circuit Judges, and **VAN BEBBER**, District
Judge.[**]

---

Robert Schneider, formerly a Denver Police Officer and member of the

Metro Special Weapons and Tactics Bureau (the "SWAT" bureau or division),

filed this action under 42 U.S.C. § 1983 against the City and County of Denver

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**] The Honorable G. Thomas Van Bebber, United States District Judge for
the District of Kansas, sitting by designation.

(the "City"). In his complaint, Mr. Schneider alleged that his transfer to the Denver Police Training Academy from the SWAT division was in retaliation for his exercise of his First Amendment right to free speech–namely, his testimony criticizing one of the Denver Police Department's training programs. Mr. Schneider also alleged that he was constructively discharged from the SWAT division.

A jury awarded Mr. Schneider $75,000 in compensatory damages on his retaliatory transfer claim. However, the jury found in favor of the City on Mr. Schneider's constructive discharge claim. On appeal, the City challenges certain evidentiary rulings and the damage award. The constructive discharge finding is not at issue.

We have jurisdiction pursuant to 28 U.S.C. § 1291. We hold that, despite any erroneous evidentiary ruling, there was sufficient evidence to support the jury's conclusion that Mr. Schneider established his claim of retaliatory discharge in the exercise of his First Amendment right of freedom of expression.

## I. FACTUAL BACKGROUND

### A. 1998 civil service hearing testimony

On March 12, 1998, Mr. Schneider testified in a civil service hearing as an expert on firearms training. He gave testimony criticizing the Denver Police Department's training in the area of decisional shooting. The hearing centered

around a Denver police officer who had been terminated from the Department earlier that year for his involvement in a police shooting in 1988. In 1985, the same officer had been involved in another incident that resulted in his shooting and killing Leonard Zuchel during an investigation. See Zuchel v. City and County of Denver, 997 F.2d 730 (10th Cir. 1993); Zuchel v. Spinharney, 890 F.2d 273 (10th Cir. 1989). The Zuchel family sought and won damages against the City on a claim of deliberate indifference in training of its officers that resulted in the unconstitutional use of excessive force.

The City attempted to exclude Mr. Schneider's testimony from the civil service hearing. Part of Mr. Schneider's testimony noted that as of March 1998, the Denver Police Department had done nothing to improve its decisional shooting training since the Zuchel incident and resulting court decisions. Mr. Schneider also testified that Mr. Spinharney had received no additional training after the Zuchel decision.

B. The events preceding Mr. Schneider's transfer

In 1997, the Department had purchased a decisional shooting training system called the Range 2000, which was delivered in January 1998. On March 20, 1998, Captain Ed Bingham wrote a memo to his Division Chief, Heather Coogan, who commanded at the training academy. He noted that the new system would be operational on April 1, 1998, and that it required at least one additional person for its operation and implementation. Division Chief Coogan requested

Chief of Police David Michaud and the Division Chief of Patrol Tim Cuthriell to transfer someone to the academy to run the new system.

As of April 1998, Mr. Schneider had been assigned to the Metro SWAT division for eighteen continuous years. Apparently, Mr. Schneider had applied for a transfer to the Academy approximately one year earlier. Chief Cuthriell telephoned Mr. Schneider's supervisor, Captain Collier, to inform him of the transfer. Captain Collier testified that he had no "inkling" before April 1, 1998 that Mr. Schneider would be transferred. Aple's Supp. App. at 22. On April 1, 1998, Mr. Schneider received notice from his shift supervisor that he was being transferred to the Denver Police Academy, effective April 6, 1998.

Captain Collier testified that the customary practice leading up to a transfer would involve his input and participation in any discussions before the transfer of a member of his division. See id. at 22-23. He stated he was not consulted in the decision and as a result believed the transfer was a "done deal." Id. at 25. Captain Collier also discussed Mr. Schneider's performance evaluations. He testified that Mr. Schneider received perfect scores for his interpersonal skills, including his ability to effectively interact with department members of various ranks and his responses to criticism.

Chief Cuthriell testified that before the transfer he had spoken several times with Captain Collier regarding problems Captain Collier was having with Mr. Schneider. Chief Cuthriell claimed that he then inquired whether Captain Collier

-4-

was willing to give up Mr. Schneider from Metro SWAT because of the troubles he was having with Mr. Schneider. Captain Collier disputed this claim. See id. at 73, 154. Chief Cuthriell also testified that Captain Collier was responsible for transferring Mr. Schneider. Id. at 41.

Former Chief of Police David Michaud, who ultimately ordered Mr. Schneider's transfer, provided yet a different explanation of events. Chief Michaud denied any direct involvement, claiming it was a "low level" transfer which he simply approved. Id. at 100. He also claimed that the transfer was due to budget cuts mandated by City Council. Chief Michaud further testified that he "never heard what he [Mr. Schneider] testified to," and denied receiving a phone call about Mr. Schneider's testimony. Id. at 70-71. Chief Michaud added that he knew Mr. Schneider believed the Denver Police Department's training in decisional shooting was inadequate, and said that "[i]n a sense, I agreed with him." Id. at 71-72. Thus, Chief Michaud appeared to deny being upset or angry with Mr. Schneider for testifying against the City on this issue.

In contrast, Chief Coogan, from the Academy, testified that she was present in Chief Michaud's office when he received a phone call about Mr. Schneider's testimony in the civil service hearing. "He slammed the phone down and cussed, [he] was angry; and he told the people in the room that Bob Schneider had testified against us at the . . . civil service hearing." Id. at 89. She testified Chief Michaud was angry Mr. Schneider had testified.

C. Mr. Schneider's assignment to the police academy

Upon his arrival at the Denver Police Academy on Monday, April 6, 1998, Mr. Schneider discovered that he was not expected by the Academy staff. Captain Bingham (the Commander of the Training Academy) had not been advised of the transfer before April 1, 1998. Thus, on starting his new position Mr. Schneider had no office, desk, chair, telephone, or computer. In addition, notwithstanding Chief Cuthriell's claim that Mr. Schneider was transferred to the Academy to run the decisional shooting training system, Mr. Schneider was advised by Captain Bingham that his duties would not include decisional shooting training.

Mr Schneider testified that his transfer to the Academy was devastating to his family life. Captain Collier, Lt. Phelan, Sergeant Michael Hughes, and Deputy Chief of Operations Walter Abrams also testified Mr. Schneider was disappointed and unhappy with the transfer. See id. at 14, 91, 93, 98 and Aplt's App. ex. D at 329. Mr. Schneider testified that his assignment at Metro SWAT had allowed him to be at home with his young children during the day, allowing him to be actively involved in raising his two sons. The only available shifts at the Academy were day shifts. Although Mr. Schneider volunteered to work in a proposed decisional shooting training program at the Academy, which would have allowed him to work nights again, the program was never implemented.

Mr. Schneider also testified regarding the strain the transfer had placed upon his marriage and his friendships. Mr. Schneider testified that he had

-6-

"bonded" with his fellow technicians in the Metro SWAT Bureau, which he termed his "second family." Aple's Supp. app. at 134(A). Mr. Schneider testified that he did not "fit in" at the Academy. Id.

Mr. Schneider discussed his transfer and his treatment at the Academy with Sergeant Mike Hughes, a past staff member of the Academy. Sgt. Hughes, a friend of Chief Cuthriell, went to Chief Cuthriell to discuss the transfer and to see if Chief Cuthriell could intervene. Sgt. Hughes also inquired as to the reason Mr. Schneider was transferred. Sgt. Hughes testified that Chief Cuthriell indicated "[t]hat Bob was being transferred because of his testimony." Id. at 43. Sgt. Hughes testified that Chief Cuthriell did not indicate who had ordered the transfer.

D. May 22, 1998 meeting

Mr. Schneider admitted that he did not hide his disappointment surrounding his transfer. He complained about his teaching requirements and his hours, and he made it known that he desired to return to the Metro SWAT Bureau. On May 22, 1998, Department supervisors met with Mr Schneider. Those present included Mr. Schneider, Chiefs Coogan and Cuthriell, Captain Collier, and Lieutenant Jennifer Steck. Chief Coogan testified that the gist of the meeting was to clear up Mr. Schneider's belief that he might go back to Metro SWAT. Chief Coogan was under the impression that Metro SWAT had requested that Mr. Schneider be transferred to the Academy. She testified that at the meeting, however, Captain Collier denied ever wanting Mr. Schneider transferred and that Captain Collier

said he was ordered to transfer Mr. Schneider and that anyone who suggested otherwise was a "liar." Id. at 34; 91-92. Captain Collier's testimony corroborated that of Chief Coogan on this point.

Chief Coogan also testified she was prepared to let Mr. Schneider return to Metro SWAT and she asked Captain Collier if he would take him back. Captain Collier responded negatively, apparently because there was no spot available for Mr. Schneider. Chief Cuthriell testified that he did not believe Captain Collier had been candid during this meeting and that Captain Collier had apparently misled Chief Coogan.

Chief Coogan testified that at this point the meeting came to an immediate end. She testified that Mr. Schneider looked "devastated," as though "it had just occurred to him that he had been lied to and betrayed." Id. at 93. A few days later, Mr. Schneider resigned his position.

E. Procedural posture

The jury awarded Mr. Schneider $75,000 in compensatory damages. On appeal, the City contests (1) the admission of two verdict forms from other actions against the City; (2) the exclusion of purported impeachment testimony from Sergeant Hughes; and (3) the $75,000 compensatory damages award, which the City maintains was a product of passion and prejudice and was excessive.

We agree that one verdict form should not have been admitted, but we determine that, because this evidence did not unduly influence the jury's verdict, the error was harmless. In addition, the district court did not abuse its discretion when it excluded Sergeant Hughes' purported impeachment testimony. Finally, we hold that the jury's award of compensatory damages is supported by the evidence in the record and does not shock the judicial conscience. Therefore, for the reasons set forth below, we affirm the judgment of the district court.

## II. DISCUSSION

We review a district court's determination regarding admission of evidence for abuse of discretion. Boughton v. Cotter Corp., 65 F.3d 823, 832 (10th Cir.1995). We will not disturb the court's ruling unless we have "a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." McEwen v. City of Norman, 926 F.2d 1539, 1553-54 (10th Cir. 1991) (internal quotation marks and citation omitted). If we find error in the admission of evidence, "we will set aside a jury verdict only if the error prejudicially affects a substantial right of a party." San Juan v. IBP, Inc., 160 F.3d 1291, 1296 (10th Cir. 1998). Evidence admitted in error can only be prejudicial "if it can be reasonably concluded that . . . without such evidence, there would have been a contrary result." Hinds v. General Motors Corp., 988 F.2d 1039, 1049 (10th Cir. 1993).

If the complaining party failed to make a contemporaneous objection at trial, however, we review the admission of evidence under a plain error standard. See Pandit v. Am. Honda Motor Co., Inc., 82 F.3d 376, 379 (10th Cir. 1996); Fed. R. Evid. 103(d). The City maintains, unhelpfully, that we should consider the admission of the verdict forms de novo. The City admits that although we generally review a trial court's evidentiary rulings for abuse of discretion, where the trial court failed to set forth its reasons underlying the evidentiary ruling, we should review that decision de novo. Under this theory, if the trial court did not balance the probative value of the evidence against its prejudicial effect pursuant to Federal Rule of Evidence 403, we should consider the evidence's admissibility de novo.

We disagree with the City's characterization of the trial court's evaluation of the verdict forms as demonstrating "little or no legal analysis." Aplt's Br. at 9; see also Aplt's App. ex. E, at 382-391, 424-427. Although the trial court did not explicitly rule on the prejudicial impact of this evidence, it did so implicitly by permitting the evidence under Rule 404(b). Moreover, the trial court carefully considered the factual underpinnings of the verdict forms and ultimately determined that they were admissible "over objection" and "allow[ed] full cross-examination" regarding these exhibits. Aplt's App. Ex. E, at 427. In addition,

-10-

there was ample colloquy regarding the exhibits. See id. at 381-92, 423-27, 442-51. We thus reject the City's suggestion that we conduct a de novo review of the admission of the verdict forms and review for abuse of discretion.

**A. Elements of retaliatory discharge claim**

A claim under 42 U.S.C. § 1983 alleging retaliatory discharge by a government official because of the plaintiff's constitutionally protected speech requires proof of three elements. First, the plaintiff must prove that his speech was constitutionally protected because it addressed a matter of public concern. Second, the employee's interest, as a citizen, in his speech must not be outweighed by the government employer's interest in the efficiency of its office. Third, the protected speech must have been a substantial and motivating factor in the adverse employment decision. See Mt. Healthy Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410, 416-17 (1979).

1. Admissibility of the Verdict Forms

The first issue on appeal concerns the third element: whether Mr. Schneider's testimony in the 1988 civil service commission hearing was a substantial and motivating factor in the City's decision to transfer him to the Denver Police Training Academy. The district court's decision was complicated by action of both counsel in this case; both appear to have had morphing attitudes as to their theories for admission or non-admission of the verdict forms in

question. Mr. Schneider's counsel first presented two verdict forms from other civil rights cases filed against the City for "impeachment purposes." He asked the trial court to take judicial notice of the forms. Aple's Supp. App. at 6. Mr. Schneider's counsel argued that the forms would be offered to controvert Chief Michaud's anticipated testimony that the City did not have a policy of retaliating against its employees. The court declined to rule at that time. During the trial but before their admission, counsel asked that the verdict forms be considered for "impeachment purposes and as direct evidence," Aplt's App. Ex. E, at 381, of the City's alleged policy of discriminating against employees for exercise of their rights. Before deeming the forms admissible, the district court considered the underlying facts and procedural posture of each action.

The City argues that because each form's probative value was substantially outweighed by its prejudicial impact upon the jury, its admission deprived the City of its right to a fair trial. Specifically, the City raises two objections to the admission of each jury verdict form. First the City maintains that each verdict form, which arguably indicated prior bad act(s) on the part of the defendant in those actions, was inadmissible under Federal Rule of Evidence 404(b), and could not be used to established a pattern of retaliatory conduct. Next, the City challenges each form's relevance as impeachment evidence under Federal Rule of Evidence 608(b).

a. Reed v. City and County of Denver, 96-B-38

The first verdict form, from Reed v. City and County of Denver, 96-B-38, filed May 27, 1999, involved a § 1983 action where the jury found that the plaintiff had established that her exercise of her First Amendment right to freedom of speech was a motivating factor in the City's decisions to remove her from her current position. Chief David Michaud was the supervisor in Reed, as he is here. However, the Reed verdict form indicates that the Reed jury also found that the City demonstrated it would have removed Ms. Reed from her position even if she had *not* exercised her First Amendment right to free speech. See Aplt's App. ex. A (verdict form from Reed v. City and County of Denver (filed May 27, 1999)). Thus, the Reed form indicated that Ms. Reed established by a preponderance of the evidence that the exercise of her First Amendment rights was a motivating factor in her removal, but the form also indicated that the jury found evidence in support of the City's affirmative defense that the City would have transferred her in any event.

Although the City did object to the admissibility of the Reed form before and during trial, the record actually shows that the City conceded that it revoked any objection to the Reed form. See Aplt's App. ex. E at 427 ("I have no objection to the Reed verdict form coming in as long as we can talk about the whole verdict form in Reed."). At oral argument, counsel also admitted it acquiesced to the admission of the Reed form because the form itself aided the defense: it established that the City would have transferred the employee in

-13-

question even if she had not engaged in protected speech. The City has thus waived this argument and we decline to review it. See Worden v. Tri-State Ins. Co., 34 F.2d 336, 341 (10th Cir. 1965) (noting that where one party "withdrew its objections" to the introduction of certain evidence, "no error was in fact committed"); United States v. Weiss, 930 F.2d 185, 199 (2d Cir. 1991) (holding where counsel withdrew objection to the exclusion of documentary evidence, counsel "waived his right to appeal this matter").

(b) Rowe v. City and County of Denver

(i) Rule 404(b)

The second verdict form, filed Oct. 6, 1998, arose from a Title VII action styled Rowe v. City and County of Denver. In Rowe, the jury found that the City discriminated against Ms. Rowe through a hostile work environment and intentional retaliation. See id. ex. B (verdict form from Rowe v. City and County of Denver (filed Oct. 6, 1998)). Chief Michaud testified he was not the supervisor responsible for the retaliation against Ms. Rowe, and this testimony is unrefuted.

The City challenges the admission of the Rowe verdict form under Fed. R. Evid. 404(b)[1], which generally excludes evidence of other acts for the purpose of

---

[1] Rule 404(b) provides that:
[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

-14-

proving a person acted similarly on other occasions. See San Juan v. IBP, 160 at 1297. However, "we have modified this general rule somewhat in the context of employee discharge cases requiring proof of discriminatory intent." Coletti v. Cudd Pressure Control, 165 F.3d 767, 776 (10th Cir. 1999); see San Juan, 160 F.3d at 1297 (noting that "character evidence is admissible in civil trials to show motive or intent"). For example, in San Juan, we concluded the district court correctly applied Fed. R. Evid. 404 when it admitted testimony of other employees about their treatment by the defendant employer because the evidence was relevant to the issue of the employer's discriminatory intent to mistreat employees following their work-related injuries. See id.; Spulak v. K Mart Corp., 894 F.2d 1150, 1156 (10th Cir. 1990) (holding, in an ADEA action, that the district court properly admitted testimony of other employees as probative of the defendant's discriminatory intent); Curtis v. Oklahoma City Pub. Schls. Bd. of Educ., 147 F.3d 1200, 1217 (10th Cir. 1998) (noting that "[t]estimony of other employees may be relevant in assessing an employer's retaliatory intent if the testimony establishes a pattern of retaliatory behavior or tends to discredit the employers assertion of legitimate motives").

In order for the court to find such character testimony relevant, however, the plaintiff must show the circumstances involving the other employees are such that their statements can "logically or reasonably be tied to the decision to terminate [the plaintiff]." Curtis, 147 F.3d at 1217 (internal quotation marks and citations

omitted); see Schrand v. Federal Pac. Elec. Co., 851 F.2d 152, 156 (6th Cir. 1988) (holding the trial court committed reversible error by admitting testimony of two former employees of defendant company because no evidence tied the testimony to defendant's decision to terminate). A "[p]laintiff can meet this requirement by showing that the same supervisors were involved in prior discriminatory employment actions." Heno v. Sprint United Management Co., 208 F.3d 847, 856 (10th Cir. 2000). Furthermore, "the district court should carefully scrutinize the time frame in which other alleged acts of discrimination occurred." Id.

Additionally, even though such evidence may be relevant to show motive or intent, the trial court may still properly disallow relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Fed. R. Evid. 403 (emphasis added)

The City seeks to distinguish Rowe from Mr. Schneider's action on the grounds that the former arose under Title VII. The City notes that, although the elements of a Title VII and a § 1983 prima facie case may be similar (i.e., an adverse employment action, a causal connection, and protected activity), these elements do not address the liability issue. In a Title VII action, unlike in a § 1983 action, the factfinder may impute the conduct of a supervisor to the employer. See 42 U.S.C. § 2000e-2 (noting that Title VII applies specifically to

-16-

"employers" and their "agents"); <u>McCue v. State of Kansas, Dep't of Human Resources</u>, 165 F.3d 784, 788 (10th Cir. 1999) ( "As a result of this clear statutory instruction, courts have long and consistently held that the scope of liability in Title VII actions is defined by the law of agency."). In a § 1983 action against a municipality, there must be evidence that the final decision or policy maker was responsible for the retaliation. <u>See</u> <u>Butcher v. City of McAlester</u>, 956 F.2d 973, 977 n. 2 (10th Cir. 1992) ("[I]n a § 1983 proceeding the municipality must itself be at fault, and it is not, under respondent superior, responsible for the isolated torts of its employees.").

We agree that <u>Rowe</u> involved different issues. Chief Michaud offered unrefuted testimony that the person responsible for the Title VII retaliation in the <u>Rowe</u> lawsuit was Sergeant J. O. Brown, not Chief Michaud. Unlike the employees who complained in <u>San Juan</u>–where the acts of the employer involved harassment and mistreatment of employees following their injuries or claims for medical benefits–Mr. Schneider can demonstrate little or no connection with the <u>Rowe</u> case. There is little time frame in the record regarding the underlying actions other than the 1999 date of the verdict forms and testimonial recollection. <u>See</u> <u>Heno</u>, 208 F.3d at 856 (urging trial courts to carefully scrutinize the time frame of other alleged acts of discrimination). In addition, we have found no authority allowing the admission of a *verdict form*, standing alone, as direct or circumstantial evidence. Its admission was error.

The City also disputes the admission of the Rowe verdict form under Fed. R. Evid. 608(b). Rule 608(b) governs the admissibility of specific instances of conduct of a witness for purposes of impeachment. It provides:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime . . . , may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness.

Fed. R. Evid. 608(b).

Mr. Schneider's counsel argued that the forms would controvert Chief Michaud's testimony that the City did not have a policy of retaliating against its employees. In fact, the City offered testimony from Chief Michaud affirming that the defendant City in the Rowe case was found to have intentionally retaliated against Ms. Rowe. He testified he was aware of this jury finding. Thus, the district court erred to the extent it admitted the Rowe verdict form for impeachment of Chief Michaud's testimony.[2]

### 2. Effect of evidentiary errors on the verdict

Having found error in the admission of the Rowe verdict form, we must consider whether the error "prejudicially affect[ed] a substantial right of a party"

---

[2] Curiously, Mr. Schneider's counsel, in the alternative, suggests collateral estoppel and judicial notice somehow foreclose the City from challenging the admission into evidence of the verdict form. Counsel's understanding of these theories is incorrect, and his briefing is inadequate for review by this court.

and unduly and substantially affected the jury's verdict.[3]  San Juan, 160 F.3d at 1296-97.  The City has the burden of making that showing.

Here we must also note our frustration with the designation of the record by both parties in this case.  See Fed. R. App. P. 10; 10th Cir. R. 10.   The City, as appellant, is responsible for designating those "'papers filed in the district court which are relevant to specific arguments made in the briefs'" for inclusion in the appellate record.  Green v. Johnson, 977 F.2d 1383, 1387 (10th Cir. 1992) (quoting 10th Cir. R. 10.2.1).  Furthermore, "'it is counsel's responsibility to see that the record excerpts are sufficient for consideration and determination of the issues on appeal and the court is under no obligation to remedy any failure of counsel to fulfill that responsibility.'"  Deines v. Vermeer Mfg. Co., 969 F.2d 977, 979 (10th Cir. 1992) (quoting General Order, 10th Cir., Oct. 25, 1990, p. 5); see also Adler v. Wal-Mart Stores, Inc.,144 F.3d 664, 672 (10th Cir. 1998) (noting we "have a limited and neutral role in the adversarial process, and are wary of becoming advocates who comb the record of previously available evidence and make a party's case for it").

---

[3] Ideally, of course, the district court should have instructed the jury about "limitations on the use of [the verdict form.]" Smith v. Ingersoll-Rand, Co, 214 F.3d 1235, 1250 (10th Cir. 2000).  "The burden in this situation, however, fell to [the City] to request an appropriate limiting instruction." Id.  The City does not suggest that it asked for a limiting instruction regarding the verdict form, and none was given.

After combing through the scant record nonetheless, we have found several items that would have been of great use to the City in making its argument that the admission of the verdict form substantially influenced the jury's verdict. Items that would have been helpful for us to weigh the merits of this argument include an unabridged transcript of Mr. Schneider's jury trial proceedings, including the complete closing arguments, the jury instructions and the pretrial order. See Naimie v. Cytozyme Labs., Inc., 174 F.3d 1104, 1113 (10th Cir. 1999) ("If the appellant intends to urge on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the evidence, the appellant shall include in the record a transcript of all evidence relevant to such finding or conclusion, and, if the appellant fails to do so, the court is under no obligation to remedy any failure of counsel to fulfill that responsibility") (quotations omitted). We have opted to remedy counsel's failure nonetheless and requested that the City supplement the record with the submission of the closing arguments and the jury instructions. Having reviewed these submissions, we are in a better-informed position to rule on the merits of this case.

In support of its contention that the Rowe verdict form affected the verdict, the City notes that, during closing argument, Mr. Schneider's counsel referred to the Rowe action as evidence of a previous act of retaliation. Our review of the record indicates that Mr. Schneider's counsel referred to the verdicts in three paragraphs of the twenty-plus page closing argument, and these paragraphs

include references to the <u>Reed</u> verdict form, which we are not considering on appeal.[4] The <u>Rowe</u> verdict form was not the primary evidence on which Mr. Schneider's counsel relied. Instead, counsel carefully reviewed the weight of the evidence.

Our review of the record satisfies us that there was sufficient circumstantial evidence to temper the evidentiary errors and support the jury's verdict that the City fired Mr. Schneider because of his exercise of his First Amendment rights. Mr. Schneider was a long-time veteran of the Metro SWAT Bureau who had applied at one point–and was denied–a position at the Academy. While in Metro

---

[4] In closing, Mr. Schneider's counsel stated the following with reference to the verdict forms:

 It's your job as a jury to compensate Mr. Schneider for the emotional trauma that he suffered as a result of his transfer and his loss of a career. You saw how well the city listened to the verdict in <u>Zuchel</u>. You saw how well that the city listened to the verdict in Miriam Reed's case when it was found to have retaliated against her for her exercise of free speech.
 Now, you heard the city testify. You heard Chief Michaud tell you that Miriam Reed didn't tell the truth. But I anticipate you will get an instruction from this court that will tell you that Miriam Reed's speech could not have been protected by the First Amendment if it was false speech, because false speech is not protected speech.
 So did they listen to that verdict in Miriam Reed? Did they listen to verdict in Wilma Rowe?
 . . . .
 The city doesn't consider emotional distress that was caused to Bob Schneider by this transfer, just like they didn't worry about the Miriam Reed verdict.

Aplt's Supp. App. Ex. R, at 1052-53.

SWAT, he received stellar reviews and was thought to be among the most, if not the most, qualified of the instructors in the division. The jury heard evidence about the department's response, or lack thereof, to the fourteen year old <u>Zuchel</u> case. There was evidence that Mr. Schneider's testimony from the administrative hearing was far from well-received, and his subsequent transfer, one that evaded the customary bureaucratic process, was swift. Unrefuted testimony established that his transfer, ostensibly to facilitate the decisional training instruction program, apparently involved little involvement in the program. In sum, based on the record before us, there was sufficient evidence before the jury to make a decision for either party, depending upon its credibility determinations.

We therefore conclude that there was sufficient evidence before the jury to determine that Mr. Schneider's criticism of the Department was a substantial and motivating factor in the City's decision to transfer him irrespective of the erroneous admission of the <u>Rowe</u> verdict form. We cannot say that any evidentiary errors interfered with the jury's verdict. <u>See</u> <u>San Juan</u>, 160 F.3d at 1296-97.

### B. Testimony from Sergeant Hughes

The City next challenges the exclusion of certain testimony from Sergeant Hughes. During cross-examination, the City's counsel asked Sgt. Hughes whether his friendship with Chief Cuthriell became strained when the Chief led the Internal Affairs division of the police department. Mr. Schneider's counsel objected to the

question, first claiming that the question was argumentative and irrelevant. After the judge excused the jury, the City's counsel advised the trial court it asked the question to show motive, bias, or prejudice for impeachment purposes. Mr. Schneider's counsel countered that to allow a line of questioning regarding Sergeant Hughes Internal Affairs record was unfair surprise.

The trial court asked if the City had informed Mr. Schneider's counsel about this line of questioning. The City's counsel responded it had not but maintained that no procedural or evidentiary rule required her to do so. The trial judge stated that "[her] rule, which [she] made very clear to all the attorneys, is that there were to be no surprises in this case. Everything was to be made known to the other side." Aplt's App. ex. D, at 341. She then sustained Mr. Schneider's objection because of surprise, because it would entail a mini-trial of Sgt. Hughes, and because the prejudicial effect of the evidence outweighed any probative value.

The City maintains that because Fed. R. Civ. P. 26 specifically excludes the disclosure of impeachment materials, the withholding of such material is acceptable. See Fed. R. Civ. P. 26(a)(3) ("[A] party must provide . . . the following information regarding the evidence it may present at trial other than solely for impeachment . . . .") (emphasis added). Mr. Schneider responds that discovery proceeded on the notion that all evidence would be shared between the parties.

We also note that the Advisory Committee Notes on Rule 26 state that "disclosure of such evidence–as well as other items relating to conduct of trial– may be required by local rule or a pretrial order." See Advisory Committee Notes, 146 F.R.D. at 635 (emphasis added). This significant comment is entitled to weight in consideration of the Rule. See Schiavone v. Fortune, 477 U.S. 21, 31 (1986) ("Although the Advisory Committee's comments do not foreclose judicial consideration of the Rule's validity and meaning, the construction given by the Committee is 'of weight.'"); DeBiasio v. Illinois Central Railroad, 52 F.3d 678, 685-86 (7th Cir. 1995) ("Rule 26(a)(3) of the Federal Rules of Civil Procedure does not require pretrial disclosure of evidence used 'solely for impeachment purposes.'").

We give wide discretion to the avoidance of side issues and "minitrials" by district courts. Here, the trial court had expressly noted that there were to be "no surprises" in this case, and the City was well aware of the trial court's intent. Aplt's App. ex. D, at 341 ("Everything was to be made known to the other side."). In addition, the City's counsel gave no reason that it could not have conveyed the information about the investigation of Sgt. Hughes to Mr. Schneider's counsel before trial. The City merely pointed out that Sgt. Hughes was not its witness.

Although the City's argument that Rule 26 does not require the disclosure of information to be used "solely for impeachment" is correct, the district court's reasoning demonstrates that it excluded the testimony in part because of

"surprise," but also to thwart a mini-trial and to avoid unfair prejudice under Rule 403. Aplt's App. ex. D, at 343; see id. at 340. We therefore conclude that the district court did not abuse its discretion in excluding the evidence.

### C. Compensatory damage award

Finally, the City challenges the jury's award of award of $75,000 in compensatory damages to Mr. Schneider for his emotional suffering. The City maintains that the award is excessive, that it can only be a result of passion or prejudice, and that the only evidence supporting the award was Mr. Schneider's own testimony that he was "very upset." See Aplt's App. ex. F, at 680.

Mr. Schneider counters that there is sufficient evidence in the record of his emotional distress. "In reviewing the trial judge's determination that the damages awarded by the jury were not so inadequate as to require a new trial, we are to determine whether the trial judge has abused his discretion." Black v. Hieb's Enters., Inc., 805 F.2d 360, 362 (10th Cir. 1986). "When reviewing the district court's use of its discretion regarding excessive verdict claims, we must determine whether the award was so excessive . . . as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial." Whiteley v. OKC Corp., 719 F.2d 1051, 1058 (10th Cir. 1983) (internal quotation marks omitted).

We acknowledge that much of the testimony regarding Mr. Schneider's suffering was his own, but this fact is not dispositive. See Hampton v. Dillard's Department Stores, 247 F.3d 1091, 1115 (10th Cir. 2001) (upholding compensatory damage award of $56,000 where only testimony regarding emotional suffering was that of plaintiff), cert. denied, 122 S. Ct. 1071 (2002). Not only did Mr. Schneider testify, but the jury also heard testimony from his colleagues regarding his emotional distress. Lieutenant Phelan testified to Mr. Schneider's disappointment over his transfer. See Aple's Supp. App. at 14. Captain Coogan noted Mr. Schneider's apparent despair at the Academy and during the May 22, 1998 meeting. See id. at 91-93. Deputy Chief of Operation David Abrams testified that he thought Mr. Schneider felt "hurt" and "betrayed" and "appeared depressed." Id. at 98.

Unlike this court, the jury had the opportunity to observe Mr. Schneider and the other witnesses and to credit or discredit their testimony regarding Mr. Schneider's alleged mental anguish. Under such circumstances, we cannot say the jury's decision to compensate Mr. Schneider for his alleged mental anguish either shocks the judicial conscience or raises an inference of passion or prejudice. Cf. Mason v. Oklahoma Tpk. Auth., 115 F.3d 1442, 1457 (10th Cir. 1997) (affirming jury's decision not to compensate plaintiff where only testimony regarding emotional suffering was his own, noting the jury's opportunity to observe plaintiff's testimony).

### III. CONCLUSION

For the reasons stated above, we AFFIRM the district court's judgment. The district court abused its discretion when it admitted the <u>Rowe</u> verdict form, but sufficient evidence remained for the jury to determine that the City's transfer of Mr. Schneider was retaliatory and the error did not substantially affect the verdict. In addition, the district court did not err when it excluded the impeachment testimony regarding Sergeant Hughes on the basis of unfair surprise to Mr. Schneider. Finally, the compensatory damage award in the amount of $75,000 is not excessive and is supported by sufficient evidence in the record.

Entered for the Court,

Robert H. Henry
Circuit Judge